EL VOCERO DE PUERTO RICO (CARIBBEAN INTERNATIONAL NEWS CORPORATION) Y OTROS, apelantes, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO Y OTROS, apelados.

*Número:* AC-90-181 *Resuelto:* 8 de julio de 1992

Juan R. Marchand Quintero y José E. Colón Rodríguez, abogados del apelante; Jorge E. Pérez Díaz, Procurador General, Norma Cotti Cruz, Subprocuradora General, María Adaljisa Dávila, Procuradora General Auxiliar, y Anabelle Rodríguez, Procuradora General, abogados del apelado.

La Juez Asociada Señora Naveira de Rodón emitió la opinión del Tribunal.

En esta ocasión nos corresponde decidir, en primera instancia, si aquella parte de la Regla 23 (c) de Procedimiento Criminal, 34 L.P.R.A. Ap. II, que establece que la vista preliminar se celebrará en privado a menos que al iniciarse la misma el imputado solicite que sea pública, es inconstitucional debido a que niega el acceso del público y de la prensa en esta etapa del proceso criminal, en contravención a la libertad de prensa y de expresión garantizada por la Primera Enmienda a la Constitución federal, aplicable a los estados a través de la Decimocuarta Enmienda, según este derecho ha sido interpretado en Press-Enterprise Co. v. Superior Court, 478 U.S. 1 (1986) (en adelante Press-Enterprise II).

I

Hechos

Los hechos que nutren la controversia de derecho aquí planteada son relativamente sencillos. Veamos.

En el caso de autos los hechos no están en controversia. El 31 de octubre de 1989 el Sr. José A. Purcell Ahmed, codemandante y periodista del rotativo *El Vocero de Puerto Rico* (en adelante *El Vocero*), solicitó, por escrito, de los Jueces de Distrito aquí codemandados, Hon. Milagros Rivera Guadarrama, Hon. Luis Saavedra Serrano y Hon. Carlos Rivera Martínez, que le permitieran presenciar los procesos de vistas preliminares que, al amparo de la Regla 23 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, ellos presidirían ese día. En su defecto, de ser denegada la petición para presenciar las vistas preliminares, el periodista solicitó que se grabaran los procedimientos a celebrarse para formar un récord al cual le permitieran tener acceso posteriormente.[1] La solicitud fue denegada en todas sus partes.

Esto provocó que *El Vocero* y el periodista Purcell Ahmed presentaran demanda de sentencia declaratoria e *injunction* ante el Tribunal Superior para que se declarase inconstitucional aquella parte de la Regla 23(c) de Procedimiento Criminal, 34 L.P.R.A. Ap. II, que dispone para la celebración en privado de la vista preliminar a menos que, al iniciarse la misma, el imputado solicite que la vista sea pública y se emitiese una orden de cese y desista dirigida

---

[1] El señor Purcell Ahmed presentó a cada juez codemandado copia del documento cuyo contenido transcribimos a continuación:

"SOLICITUD DE ACCESO Y PARA PRESENCIAR VISTA PRELIMINAR CELEBRADA BAJO REGLA 23 DE PROCEDIMIENTO CRIMINAL

"A: HON. JUEZ DE DISTRITO

"Soy José A. Purcell Ahmed, reportero a tiempo completo del Periódico El Vocero de Puerto Rico. Respetuosamente solicito del Honorable Tribunal que en tal capacidad que [sic] se me permita acceso y permanecer en Sala para presenciar y escuchar el procedimiento de Vista Preliminar próximo a comenzar ante usted, y toda otra que se celebre en el día de hoy de acuerdo a lo dispuesto en la Regla 23 de Procedimiento Criminal.

"En el caso de que nuestra solicitud sea denegada, se solicita que los procedimientos a seguirse sean grabados y se forme un record [sic] al cual podamos tener acceso.

"Este servidor entiende que las vistas preliminares deben ser abiertas al público y a la Prensa, porque este procedimiento tiene una presunción de ser pública [sic] de acuerdo con la libertad de prensa garantizada por la Primera Enmienda de la Constitución de los Estados Unidos.

"Respetuosamente Sometido." (Énfasis en el original suprimido.)

contra cualquier magistrado a los fines de instrumentar dicha decisión. Fundamentaron su petición en las disposiciones de la Primera Enmienda a la Constitución federal norteamericana, aplicables a los estados a través de la Decimocuarta Enmienda, relativas a los derechos a la libertad de prensa y de expresión.

En instancia los demandantes cimentaron su argumentación en los ya mencionados derechos a la libertad de prensa y de expresión, según condicionados por el derecho a un juicio justo e imparcial de acuerdo con lo establecido en la Sexta Enmienda a la Constitución federal y en *Press-Enterprise II*, resuelto por el Tribunal Supremo federal. Alegaron que dicho caso establece que la Primera. Enmienda garantiza al público y a la prensa el acceso a la vista preliminar celebrada en Puerto Rico.

El Estado por su parte solicitó la desestimación de la demanda. Planteó que la norma de acceso a vista preliminar de *Press-Enterprise II* no es aplicable en Puerto Rico por ser restringida y distinguible. Argumentó que dicha norma es de aplicación sólo a vistas preliminares según se conducen en el estado de California, donde, distinto a Puerto Rico, existe una tradición de apertura. Arguyó, además, que las vistas celebradas en ausencia del público en general y de la prensa garantizan la celebración de un juicio justo e imparcial y que la secretividad de la vista protege, además, el derecho a la intimidad de los imputados. Argumentó también que el Estado tiene un interés apremiante en proveer esta protección, lo que justifica la clausura de la vista como norma general.

El 29 de enero de 1990 el foro de instancia dictó sentencia mediante la cual declaró sin lugar la demanda con imposición de costas a los demandantes. Resolvió en su sentencia que el derecho a la intimidad y a que se le garantice a todo acusado un juicio justo e imparcial tiene prioridad sobre el derecho limitado de acceso del público y de la prensa a los procedimientos de vista preliminar tal y como

se conducen en Puerto Rico. Preservó así el carácter privado de la vista preliminar.

Inconformes con esa decisión, los demandantes apelaron. Plantearon que erró el tribunal de instancia al resolver que "no les [sic] asiste derecho alguno bajo la Primera Enmienda Federal a presenciar las vistas preliminares que se celebren en nuestra jurisdicción al amparo de la Regla 23 de Procedimiento Criminal, contrario a lo resuelto en *Press-Enterprise II*".

## II

*La Jurisprudencia del Tribunal Supremo federal antes de Press-Enterprise II*

Para poder determinar el verdadero alcance de *Press-Enterprise II* y su posible aplicación a la situación de autos, es necesario que analicemos la trayectoria de lo resuelto por el Tribunal Supremo de Estados Unidos con relación al derecho de la prensa y del público al acceso limitado a un juicio criminal.

En 1979 el Tribunal tuvo la primera oportunidad de confrontarse con el problema en *Gannett Co. v. De Pasquale*, 443 U.S. 368 (1979) (en adelante *Gannett*). En un caso por asesinato en segundo grado, robo y hurto mayor (*grand larceny*), con posterioridad a la lectura de la acusación (*arraignment*), se solicitó la supresión de evidencia, una confesión alegadamente involuntaria y cierta evidencia, física. Los acusados pidieron la exclusión del público y de la prensa alegando que la publicidad adversa que estaban recibiendo ponía en peligro el que ellos pudiesen obtener un juicio justo e imparcial. El Fiscal no se opuso a la moción y el tribunal la concedió. Gannett Co., una empresa que publicaba dos (2) periódicos en Rochester, Nueva York, solicitó que se dejara sin efecto dicha orden y se le entregaran copias de la transcripción de la vista. La Corte de

Apelaciones de Nueva York resolvió que al amparo de la ley de Nueva York se presume que los juicios criminales son abiertos al público, incluyendo la prensa, pero que en este caso se había rebatido la presunción por el peligro que representaba para que los acusados pudiesen obtener un juicio justo.

El Tribunal rehusó reconocer que bajo la Sexta Enmienda hubiese un derecho de acceso del público a un juicio criminal y a entrar a considerar, específicamente, si bajo la Primera y Decimocuarta Enmiendas existía tal derecho. Utilizando el análisis de la experiencia y la lógica concluyó que los procedimientos con anterioridad al juicio, precisamente por consideraciones de juicio justo, nunca se caracterizaron por el mismo grado de apertura que el juicio en sí y que históricamente estos procedimientos no eran abiertos. El Tribunal Supremo federal, entonces, procedió a determinar que la Constitución de Estados Unidos no le daba a los peticionarios un derecho afirmativo de acceso a este procedimiento anterior al juicio cuando todos los participantes del litigio (los acusados, el Fiscal y el juez) estaban de acuerdo en que éste debía permanecer cerrado para proteger el derecho a un juicio justo.(²)

Un (1) año más tarde se presentó ante la atención del Tribunal *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) (en adelante *Richmond*). En este caso el Tribunal Supremo resolvió por primera vez que al amparo de la Primera y Decimocuarta Enmiendas, la prensa y el público en general tenían un derecho de acceso limitado a un juicio criminal.

Se trataba de un caso por asesinato en que el acusado

---

(²) La mayoría del Tribunal entendió que lo que estaba planteado era si el público tenía un derecho constitucional a asistir a un procedimiento accesorio al juicio en un proceso criminal, aunque tanto el acusado como el Fiscal y el juez estén de acuerdo en que el procedimiento debe ser cerrado para garantizar un juicio justo.

En la actualidad sólo dos (2) de los jueces que dieron su conformidad a la opinión mayoritaria, Rehnquist y Stevens, y dos (2) jueces que disintieron, White y Blackmun, están en el Tribunal.

solicitó se cerrase el juicio al público. El Fiscal no objetó y el juez, fundamentándose en un estatuto que le permitía discrecionalmente excluir del juicio a cualquier persona que impidiese llevar a cabo un juicio justo, estuvo de acuerdo. Aunque los jueces no se pudieron poner de acuerdo para emitir una opinión, siete (7) de éstos (³) estuvieron de acuerdo en que la orden de exclusión violaba el derecho de acceso limitado del público y la prensa a un juicio criminal, según éste está garantizado por la Primera y Decimocuarta Enmiendas de la Constitución de Estados Unidos.(⁴)

Los jueces también utilizaron el análisis de la experiencia y la lógica para concluir que al amparo de la Primera y Decimocuarta Enmiendas el público tiene un derecho limitado de acceso a un juicio criminal y que en ausencia de un interés primordial fundamentado en determinaciones de hecho, el caso criminal tiene que estar abierto al público.

En 1982 el Tribunal nuevamente tuvo ante sí el planteamiento constitucional de derecho de acceso del público a un juicio criminal. *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982) (en adelante *Globe*). Esta vez se trataba de determinar la constitucionalidad de un estatuto de Massachusetts que disponía para la exclusión del público en general de juicios de ciertos delitos sexuales cuando la víctima fuese menor de dieciocho (18) años. La Corte Suprema de Massachusetts resolvió que el estatuto, bajo cualesquiera circunstancias, excluía la prensa y el público durante el testimonio de las víctimas menores. El Tribunal

---

(³) Estos jueces fueron Burger, White, Stevens, Brennan, Marshall, Stewart y Blackmun. De éstos, tres (3), White, Stevens y Blackmun, aún forman parte de ese Alto Foro.

(⁴) En opinión concurrente emitida por el Juez White, éste recalcó que este caso no hubiese sido necesario si en *Gannett Co. Inc. v. De Pasquale*, 443 U.S. 368 (1979) (en adelante *Gannett*), el Tribunal hubiese decidido que la Sexta Enmienda prohíbe que se excluya al público de un juicio criminal. En opinión concurrente el Juez Stevens expresó que la ausencia total de un récord justificando la orden de cerrar violaba la Primera Enmienda.

Supremo federal, utilizando el análisis de la experiencia y la lógica, o sea, que los juicios criminales históricamente han estado abiertos a la prensa y al público y que este acceso ha jugado un papel particularmente significativo en su funcionamiento, concluyó que la ley de Massachusetts era inconstitucional. Expresó que este derecho de acceso a un juicio criminal por parte de la prensa y del público en general no era absoluto, éstos sólo pueden ser excluidos en limitadas ocasiones. Para poderlos excluir el Estado tiene que demostrar que existe un interés gubernamental apremiante y que el remedio está diseñado de forma limitada para velar por este interés.[5]

La Juez O'Connor concurrió con el resultado haciendo constar específicamente que ella no interpretaba, ni la decisión de *Globe* ni la de *Richmond*, como unas que tuviesen efectos más allá del contexto de los juicios criminales en sí.

Dos (2) años más tarde el Tribunal consideró dos (2) casos relacionados con el derecho constitucional de acceso del público y de la prensa a un juicio criminal: *Press-Enterprise Co. v. Superior Court of Cal.*, 464 U.S. 501 (1984) (en adelante *Press-Enterprise I*) y *Waller v. Georgia*, 467 U.S. 39 (1984) (en adelante *Waller*).

*Press-Enterprise I* trataba sobre el procedimiento del *voir dire*. En un juicio criminal por la violación y asesinato de una jovencita, miembros de la prensa solicitaron que el *voir dire* se abriera al público y a la prensa. El Estado se opuso alegando que si la prensa estaba presente las respuestas del Jurado carecerían del candor necesario para asegurar un juicio justo. El juez estuvo de acuerdo y permitió que la prensa estuviese presente sólo en el *voir dire* general, no en el individual. Una vez desinsaculado el Jurado, el peticionario solicitó la transcripción de todos los

---

[5] La opinión del Tribunal la emitió el Juez Brennan, al cual se le unieron los Jueces White, Marshall, Blackmun y Powell. De éstos sólo los Jueces White y Blackmun forman parte de la plantilla del actual Tribunal.

procedimientos del *voir dire*. Tanto el acusado como el Fiscal arguyeron que el entregarla violaría el derecho de privacidad del Jurado. El Tribunal Supremo de California sostuvo tanto la orden cerrando el *voir dire* como la que denegaba la entrega de la transcripción.

Utilizando nuevamente el análisis de la experiencia y la lógica, el Tribunal Supremo federal concluyó que las garantías de un juicio criminal abierto cubrían el procedimiento del *voir dire*. Expresó que la presunción de que un juicio criminal es abierto sólo puede superarse por un interés apremiante del Estado fundamentado en determinaciones de hecho de que es necesario cerrarlo para preservar un valor mayor y que el remedio diseñado es uno limitado para preservar ese interés apremiante.(6)

En *Waller* el Tribunal se confrontó nuevamente con una vista de supresión de evidencia luego de la acusación (*indictment*). En esta ocasión el foro estatal ordenó, a pesar de las objeciones del acusado, que la vista de supresión de evidencia se celebrara en privado. El Tribunal determinó que el derecho a juicio público protegido por la Sexta y Decimocuarta Enmiendas de la Constitución federal aplica a una vista sobre supresión de evidencia y que este derecho fue violado, ya que no se justificaba cerrar toda la vista de supresión.

*Waller* trataba sobre la violación a un estatuto sobre prohibición de corrupción y otras leyes prohibiendo los juegos de azar de Georgia. El Estado obtuvo cierta evidencia mediante la interferencia telefónica. Solicitó se cerrara la vista de supresión fundamentándose en que bajo los esta-

---

(6) La opinión del Tribunal la emitió el entonces Juez Presidente Burger, a la cual se unieron los Jueces Brennan, White, Blackmun, Powell, Rehnquist, Stevens y O'Connor. De estos cinco, White, Blackmun, Rehnquist, Stevens y O'Connor, están actualmente en el Tribunal Supremo federal.

Con relación a esta opinión resulta interesante señalar que el Juez Rehnquist, que había disentido en *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) (en adelante *Richmond*) y *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982) (en adelante *Globe*), se unió a la mayoría.

tutos de interferencia telefónica de Georgia, cualquier divulgación de información obtenida mediante el uso de una orden para interferir un teléfono, que no fuese necesaria y esencial, haría la información inadmisible en evidencia. Los acusados se opusieron.

El Tribunal indicó que nunca había considerado si el derecho del acusado bajo la Sexta Enmienda se extendía más allá del juicio en sí (*the actual proof at trial*) y si se extendía, entonces, hasta dónde. Con relación al derecho cualificado al amparo de la Primera Enmienda de la prensa y el público a asistir a un juicio criminal expresó que éste se había reconocido en los casos de *Globe* y *Richmond*, y que en *Press-Enterprise I* se había extendido este derecho a los procedimientos de *voir dire*. También hizo la observación de que en *Gannett* una mayoría de los jueces concluyó que aplicaba también a una vista de supresión de evidencia.

El Tribunal encontró que la vista de supresión se asemeja a un juicio por tribunal de derecho, donde los testigos declaran bajo juramento, los abogados argumentan sus posiciones y el resultado depende de las determinaciones de hecho que haga el tribunal. Puntualizó que con relación a la vista de supresión de evidencia la necesidad de que ésta sea abierta es grande, pues frecuentemente el fundamento para cuestionar la admisibilidad de la evidencia es la conducta impropia de la policía o del Fiscal. Resolvió, por lo tanto, que para poder sostener una orden cerrando totalmente una vista de supresión a la prensa y al público es necesario que haya un interés apremiante que se vaya a perjudicar; que el cierre no sea más amplio de lo que sea absolutamente necesario para proteger ese interés; que el tribunal haya considerado otras alternativas razonables en vez del cierre, y que haya hecho determinaciones de hecho que apoyen el cierre.[7]

---

[7] La opinión unánime del Tribunal la suscribió el Juez Powell.

Los casos *Gannett, Richmond, Globe, Press Enterprise I* y *Waller*, que tratan sobre procedimientos llevados a cabo con posterioridad a la presentación de la acusación, demuestran con meridiana claridad que con relación al juicio criminal, o sea, la etapa adjudicativa, el Tribunal Supremo de Estados Unidos consistentemente ha decidido que a la prensa y al público en general les asiste un derecho de acceso cualificado al amparo de la Primera y Decimocuarta Enmiendas; y que el acusado tiene derecho a un juicio público protegido por la Sexta y Decimocuarta Enmiendas, pero que este derecho no implica que tenga derecho, igualmente, a que el juicio sea cerrado si así lo solicita. El Tribunal ha reconocido la existencia de una presunción a favor de que el juicio criminal sea abierto y que para controvertir esta presunción hay que demostrar la existencia de un interés apremiante; que el cierre sea necesario para proteger este interés; que el tribunal haya considerado otras alternativas razonables, y que se hayan hecho determinaciones que apoyen el cierre.

Con relación al *voir dire* y a la vista de supresión de evidencia, el Tribunal estimó que estos procedimientos, llevados a cabo con posterioridad a la presentación de la acusación, eran parte del juicio criminal, o sea parte de la etapa adjudicativa, y que la experiencia y la lógica apoyan la conclusión de que a éstos les sea aplicable la presunción de apertura.

Resumiendo, todos estos casos versan sobre procedimientos que se llevan a cabo con posterioridad a que se incoe la acusación y en todos el Tribunal utilizó el análisis de la experiencia y la lógica. Resulta importante tener presente que ninguno de ellos tiene que ver con algún procedimiento que se lleve a cabo en la etapa investigativa judicial, o sea, con anterioridad a la presentación de la acusación. El Tribunal en su análisis tuvo especial cuidado en señalar que se estaba refiriendo al juicio criminal y a

procedimientos que por su naturaleza, al ser posteriores a la presentación de la acusación, se consideran parte del juicio criminal, o sea, parte de la etapa adjudicativa. Es a la luz de esta trayectoria jurisprudencial que tenemos que analizar el alcance de la norma enunciada en *Press-Enterprise II*.

### III

*Press-Enterprise II y la vista preliminar según celebrada en California*

En 1986 el Tribunal Supremo de Estados Unidos se enfrentó a un planteamiento similar al que nos ocupa en este momento. En *Press-Enterprise II* tuvo que decidir si el allí peticionario tenía derecho, bajo la Primera Enmienda a la Constitución federal, a tener acceso a la transcripción de una vista preliminar. La vista se celebró contra un enfermero a quien se le acusó de haberle dado muerte a doce (12) pacientes a quienes les administró dosis masivas de la droga cardíaca conocida por lidocaína. Al iniciarse la vista preliminar en su contra, el acusado solicitó la exclusión del público de este procedimiento al amparo de la Sec. 868 del Código Penal de California.[8] No hubo oposición a su soli-

---

[8] La Sec. 868 del Código Penal de California, al momento de celebrarse la vista preliminar contra el señor Díaz, disponía lo siguiente:

"The examination *shall be open and public.* However, upon the request of the defendant and a finding by the magistrate that exclusion of the public is necessary in order to protect the defendant's right to a fair and impartial trial, the magistrate shall exclude from the examination every person except the clerk, court reporter and bailiff, the prosecutor and his or her counsel, the Attorney General, the district attorney of the county, the investigating officer, the officer having custody of a prisoner witness while the prisoner is testifying, the defendant and his or her counsel, the officer having the defendant in custody and a person chosen by the prosecuting witness who is not himself or herself a witness but who is present to provide the prosecuting witness moral support, provided that the person so chosen shall not discuss prior to or during the preliminary examination the testimony of the prosecuting witness with any person, other than the prosecuting witness, who is a witness in the examination. Nothing in this section shall affect the right to exclude witnesses as provided in Section 867 of the Penal Code." (Énfasis suplido.) West's

citud y el juez la concedió por entender que celebrar la vista en privado era necesario, pues el caso atrajo gran publicidad a nivel nacional y los medios de información podrían divulgar sólo un lado de la historia. La vista preliminar se extendió durante cuarenta y un (41) días. Al concluir, Press-Enterprise solicitó del tribunal que se divulgara el contenido de la transcripción del procedimiento. El juez denegó la solicitud y selló el récord.

Posteriormente, el Estado de California acudió al Tribunal Superior y solicitó que se divulgara al público el contenido de la transcripción de la vista preliminar. Press-Enterprise se unió a esta solicitud. Díaz se opuso y alegó que entregar la transcripción resultaría en publicidad perjudicial antes del juicio. El Tribunal Superior concluyó que había una "posibilidad razonable de que la divulgación de parte o todo el contenido de la transcripción pudiera perjudicar el derecho del acusado a un juicio justo e imparcial".

Press-Enterprise acudió ante la Corte de Apelaciones del Estado, la cual denegó el auto solicitado. El Tribunal Supremo de California denegó igualmente el auto de Press-Enterprise y sostuvo que, bajo la Primera Enmienda a la Constitución federal, no existía un derecho de acceso a las vistas preliminares. Al no encontrar un derecho de acceso bajo la Primera Enmienda, pasó a considerar las circunstancias en que procedía excluir al público de una vista preliminar de acuerdo con las disposiciones del Código Penal. Concluyó que, bajo la Sec. 868 del Código, si el acusado establecía una "posibilidad razonable de perjuicio sustancial", el peso de la prueba se transfería al Estado o a los medios de comunicación para que demostraran, por preponderancia de la prueba, que no existía tal posibilidad razonable de perjuicio.

El Tribunal Supremo federal aceptó revisar la decisión mediante recurso de *certiorari* y revocó al Supremo de

---

Ann.Cal.Penal Code Sec. 868, pág. 708.

California. En su opinión identificó la controversia como referente al derecho del público bajo la Primera Enmienda. Destacó la conclusión del Tribunal Supremo de California de que la Primera Enmienda no tenía implicación en este caso debido a que no se trataba de un juicio criminal, sino de una vista preliminar. *Expresó que la discusión en torno a la Primera Enmienda no puede resolverse únicamente a base de no darle al proceso la etiqueta de "juicio", sobre todo cuando la vista preliminar se conduce de forma muy similar a un juicio en su fondo.*

En su análisis, el Supremo federal acudió a las dos (2) consideraciones complementarias utilizadas anteriormente en casos relacionados con reclamaciones de acceso a procesos criminales bajo la Primera Enmienda, la experiencia y la lógica. En primer lugar consideró el historial de apertura a la prensa y al público en general del proceso, "debido a que una tradición de accesibilidad implica el juicio favorable de la experiencia". En segundo lugar consideró si el acceso público juega un papel significativo en el funcionamiento del proceso particular de que se trate.

Con estos principios en mente procedió a analizar la controversia de *Press-Enterprise II*. En cuanto a la primera consideración, la de la experiencia, que no es otra cosa que un análisis histórico, examinó el proceso de vista preliminar similar a la celebrada en California (*as conducted in California*). Con relación al mismo señaló lo siguiente:

En primer lugar, ha existido una tradición de accesibilidad a las vistas preliminares similares a las celebradas en California. A pesar de que los procesos ante el gran jurado han sido tradicionalmente cerrados al público y al acusado, las vistas preliminares celebradas ante magistrados neutrales e independientes han sido abiertas al público. Hace mucho en el notorio juicio por traición contra Aaron Burr, por ejemplo, con el Juez Presidente Marshall actuando como juzgador, la vista de causa probable se celebró en el edificio de la Cámara de Delegados en Virginia, pues la sala del tribunal era muy pequeña para acomodar al gran número de ciudadanos interesados. Desde Burr

hasta el presente las cortes estatales y federales han celebrado las vistas preliminares, de forma prácticamente uniforme, en corte abierta. Como observamos en *Gannett*, siguiendo el original del Código de Procedimiento Criminal de New York [New York Field Code of Criminal Procedure] publicado en 1850, muchos Estados han permitido la celebración de vistas preliminares privadas a petición del acusado. Pero aún en estos Estados los procedimientos se presumen abiertos al público y se cierran sólo mediante mostración de causa. Por tanto, a las vistas preliminares abiertas se les ha reconocido "el juicio favorable de la experiencia". (Traducción nuestra y citas omitidas.) *Press-Enterprise II*, págs. 10–11.

En cuanto a la segunda consideración, la de la lógica, el Supremo federal estableció lo siguiente:

El segundo asunto consiste en determinar si el acceso público a las vistas preliminares similares a las celebradas en California, juega un papel particularmente significativo en el desarrollo de estos procesos. Hemos determinado en *Richmond Newspapers, Globe* y *Press-Enterprise I*, que el acceso del público a los juicios criminales y a la selección de jurados es esencial para el funcionamiento adecuado del sistema de justicia criminal. *Las vistas preliminares de California son lo suficientemente parecidas al juicio como para justificar la misma conclusión.*

En California, para llevar a un acusado de delito grave [*felon*] a juicio, el fiscal puede escoger entre la acusación hecha por un gran jurado o una determinación de causa probable hecha en una vista preliminar. Aun cuando el imputado haya sido acusado [*indicted*] por un gran jurado, *éste tiene un derecho absoluto a una elaborada vista preliminar* ante un magistrado neutral. El acusado tiene derecho a comparecer personalmente a la vista, a estar representado por abogado, a contrainterrogar testigos hostiles, a presentar prueba exculpatoria y a suprimir evidencia ilegalmente obtenida. Código Penal de California Anotado, Secs. 859–866 (West 1985), Sec. 1538.5 (West Supp. 1986). Si el magistrado determina que existe causa probable, el acusado está destinado a ir a juicio; en la mayoría de los casos, tal determinación culmina en una alegación de culpabilidad.

Es cierto que, contrario a un juicio criminal, la vista preliminar de California no puede resultar en la convicción del acusado y que la adjudicación se hace ante un magistrado u otro oficial judicial en ausencia de un jurado. Pero estos rasgos, por sí solos, no convierten el acceso público en menos esencial para el funcionamiento apropiado de los procedimientos dentro del

> sistema de justicia criminal como un todo. Debido a lo extenso de su alcance, la vista preliminar es frecuentemente el paso final y más importante del procedimiento criminal. Según lo estableció el Tribunal Supremo de California ... en muchos casos la vista preliminar provee la única oportunidad para que el público observe el sistema de justicia criminal.
>
> Igualmente, la ausencia de un jurado, que desde hace mucho se ha reconocido como "una inapreciable salvaguarda contra el fiscal corrupto o demasiado celoso así como contra el juez sumiso, prejuiciado o excéntrico, " hace aún más significativo el acceso del público a una vista preliminar. "En una sociedad abierta el Pueblo no exige infalibilidad de sus instituciones, pero es difícil que acepte aquello que se le prohíbe observar." (Traducción nuestra, citas omitidas y énfasis suplido.) *Press-Enterprise II*, págs. 11–13.

Establecido lo anterior, el Supremo federal concluyó que, bajo las disposiciones de la Primera Enmienda, el derecho limitado de acceso (*qualified First Amendment right to access*) *aplica a las vistas preliminares similares a las celebradas en California.*

Una vez resuelto que el público tenía derecho a estar presente en la vista preliminar, estableció que este procedimiento no podía celebrarse en privado a menos que se hiciesen para el récord determinaciones específicas que demostraran que "la secretividad [era] esencial para preservar valores primordiales y [que] esta[ba] específicamente diseñada para adelantar ese interés". *Press-Enterprise II*, págs. 13–14.

Rechazó el análisis hecho por el Tribunal Supremo de California que establecía que el acusado, para prevalecer en la solicitud de que la vista fuese privada, tenía que demostrar una "posibilidad razonable (*reasonable likelihood*) de perjuicio sustancial". Señaló que si el interés reclamado es el derecho del acusado a un juicio justo, la vista preliminar debe celebrarse en privado sólo si se hacen determinaciones específicas que demuestren que, primero, existe una "probabilidad sustancial" de que el derecho del acusado a un juicio justo será perjudicado por la publicidad y que la

vista en privado evitaría este perjuicio, y, segundo, que no existen "alternativas razonables" al cierre que protejan adecuadamente el derecho del acusado a un juicio justo. El Supremo federal indicó que el análisis (*test*) de "posibilidad razonable" del Supremo de California le imponía un peso menor al acusado que el de "probabilidad sustancial" siendo éste último el requerido cuando está en juego la Primera Enmienda. Por estas razones revocó la decisión del Tribunal Supremo de California.

Como podrá observarse, el Tribunal Supremo federal en *Press-Enterprise II, se limitó a resolver que la vista preliminar en California, por funcionar de forma parecida a un juicio criminal (the preliminary hearing [which] functions much like a fullscale hearing), o sea, por éstas constituir casi un "mini juicio", les eran aplicables las normas sobre el derecho a acceso limitado de la prensa y el público al juicio criminal protegido por la Primera y Decimocuarta Enmiendas.*

Con este marco de referencia es que debemos analizar el alcance de la decisión del Tribunal Supremo de Estados Unidos en *Press Enterprise II*, haciendo un detallado análisis comparativo entre la vista preliminar de California y la nuestra. Si de este análisis surgiera que la vista preliminar nuestra es extensa y elaborada, lo suficientemente parecida a un juicio en su fondo como lo es la de California, el precedente establecido en *Press Enterprise II*, sería de entera aplicación. De otra parte, si estamos ante una vista preliminar que por su naturaleza y funcionamiento se asemeja a una vista tipo investigativa judicial, entonces no le sería aplicable *Press-Enterprise II*.

Sin embargo, esto no resuelve el problema. De no ser aplicable *Press-Enterprise II*, debemos analizar nuestra vista preliminar a la luz de la experiencia y la lógica, tomando en consideración el sitio donde se celebra y el proceso de que se trata, para determinar si aún no siendo un procedimiento similar al juicio, a la prensa y al público les

asiste un derecho de acceso cualificado bajo la Primera y Decimocuarta Enmiendas. Una vez concluido este análisis es que podremos evaluar la constitucionalidad de la Regla 23 de Procedimiento Criminal, *supra*, a la luz de estas disposiciones constitucionales.

Ahora bien, si concluimos que la Regla 23, *supra*, no violenta la Primera Enmienda, entonces tenemos que entrar a analizar si "[n]uestra Constitución [que] reconoce y concede unos derechos fundamentales con una visión más abarcadora y protectora", en el balance de intereses, le concede a la prensa y al público en general este derecho de acceso cualificado a la vista preliminar. *López Vives v. Policía de P.R.*, 118 D.P.R. 219, 226–227 (1987).

## IV

*La vista preliminar en California*

La vista preliminar californiana aparece incluida en las Secs. 858 a 883, Capítulo Siete (7), del Código Penal de dicho estado. West's Ann.Cal.Penal Code Secs. 858–883. El mecanismo de vista preliminar existente en California fue adoptado en 1872. Desde entonces y hasta el presente se dispuso para que la vista fuera celebrada públicamente excepto cuando, para defender y preservar el derecho del acusado a un juicio justo e imparcial, el magistrado que la celebra determine que la misma debe ser cerrada al público. Este aspecto está cubierto por la Sec. 868 del Código Penal de California, la cual examinaremos con detenimiento más adelante.

Un examen de las disposiciones del Código Penal californiano referentes a la vista preliminar celebrada en ese estado nos convence de que ciertamente se trata de un proceso elaborado, según apuntó el Tribunal Supremo federal en *Press-Enterprise II*. Existe todo un capítulo del Código Penal de California que cubre diversos aspectos de lo que

puede acontecer en la vista preliminar. Hay ciertas secciones de ese capítulo cuyo análisis es imprescindible para la solución de la controversia de autos. Estas proveen las herramientas necesarias para que el mecanismo de la vista preliminar cobre vida procesal. Examinémoslas en detalle.

En California, toda persona a quien se le impute un delito para el cual tenga jurisdicción el tribunal superior, debe ser llevado sin dilación ante un magistrado. El magistrado le entregará copia de la denuncia y le informará de su derecho a estar asistido de abogado. Puede contratar uno de su predilección y, si carece de medios económicos, el Estado se lo proveerá. Una vez comparezca el abogado o cuando se determine que el imputado puede comparecer *pro se*, el Fiscal le entregará o pondrá a su disposición copia del informe de delitos y arrestos preparado por la policía Sec. 859. Si se trata de un delito grave y el imputado no hace alegación de culpabilidad, el magistrado cuando éste comparezca para la lectura de los cargos, (*arraignment*), señalará fecha para la vista preliminar del caso y concederá no menos de dos (2) días para que el Fiscal y la defensa del acusado se preparen para la vista. Sec. 859b. A petición del Fiscal o la defensa, el magistrado expedirá citaciones para la comparecencia de los testigos que se encuentren dentro del estado. Se ha establecido que tanto el Ministerio Público como el acusado tienen derecho a que la vista preliminar se celebre lo más pronto posible y, a menos que ambos renuncien a ese derecho o exista justa causa para extenderla, la vista preliminar se celebrará dentro de los próximos diez (10) días judiciales (*court days*) contados a partir de la lectura de los cargos o desde que hace alegación. Si el acusado se encuentra detenido, el magistrado deberá desestimar la denuncia si la vista preliminar se señala para, o se continúa, luego de haber transcurrido los diez (10) días antes mencionados. La desestimación no procederá si el acusado renuncia personalmente a su derecho a que se le celebre la vista preliminar dentro del pe-

ríodo de diez (10) días o el Fiscal establece justa causa para continuar el procedimiento una vez transcurrido dicho término. Sec. 859b.[9]

Se ha dispuesto, además, que la vista preliminar debe celebrarse en una sola sesión o, de lo contrario, la denuncia[10] debe ser desestimada. No procederá la desestimación cuando sea el magistrado quien la posponga, pero para hacerlo tiene que mostrar, mediante affidávit, justa causa. La posposición no debe exceder de diez (10) días judiciales a menos que ocurra cualesquiera de las situaciones siguientes: (1) el acusado renuncie personalmente a su derecho a una vista preliminar continua, o (2) el Fiscal establezca justa causa para una posposición en exceso de diez (10) días. Si el magistrado pospone la vista por un período mayor a los diez (10) días y el acusado está detenido, éste debe ser puesto en libertad. La vista preliminar no debe posponerse por más de sesenta (60) días, contados a partir de la fecha en que se concedió la posposición, a menos que el acusado lo solicite mediante moción o lo consienta (Sec. 861).

Al comenzar la vista preliminar, el acusado tiene dere-

---

[9] Con posterioridad a la opinión de *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) (en adelante *Press-Enterprise II*) en 1987, se le añadió a esta sección un párrafo para establecer, sin que resulte limitante, aquellas instancias que puedan ser consideradas como "justa causa". Se añadió, además, que cualquier prórroga bajo esas circunstancias debe limitarse a un máximo de tres (3) días judiciales adicionales. Asimismo se estableció que si la vista preliminar es iniciada o se extiende más allá del período de diez (10) días, el imputado debe ser puesto en libertad a menos que: (1) él mismo solicite el señalamiento o continuación de la vista preliminar una vez transcurrido el período de diez (10) días; (2) se le impute un delito grave que apareje pena de muerte y la prueba es evidente y abrumadora; (3) un testigo necesario para la celebración de la vista preliminar no esté disponible debido a las acciones del imputado; (4) el abogado defensor se enferme; (5) el abogado se involucre inesperadamente en un juicio por jurado, o (6) conflictos de intereses imprevisibles que requieran la designación de un nuevo abogado. Se incluyó, además, que si la vista preliminar se señala o se extiende por un período mayor de sesenta (60) días, contados a partir de la denuncia o alegación, el magistrado deberá desestimar la denuncia a menos que el imputado renuncie personalmente a su derecho a que se le celebre la vista preliminar dentro del período de sesenta (60) días. En 1990 se añadió una sección numerada 859.1 la cual, por su relación con la Sec. 868 del Código Penal de California, discutiremos más adelante.

[10] En el ordenamiento californiano, el escrito que contiene los cargos es denominado *complaint*, inclusive después de la lectura de la acusación.

cho a que el magistrado le lea las deposiciones de los testigos examinados durante la investigación (Sec. 864). Los testigos presentados durante la vista deben ser interrogados en presencia del acusado y pueden ser contrainterrogados en beneficio de éste (Sec. 865). Una vez termine la presentación de los testigos de cargo, todo testigo presentado por la defensa debe ser juramentado y examinado. Ahora bien, a petición de la fiscalía, el magistrado requerirá una oferta de prueba con relación al testimonio esperado por parte del testigo. El magistrado no permitirá el testimonio de testigo alguno de defensa a menos que la oferta de prueba revele, a satisfacción del magistrado y de acuerdo con su mejor discreción que, de ser creído, el testimonio tendría la probabilidad razonable de establecer una defensa afirmativa, negar algún elemento del delito imputado o impugnar el testimonio de un testigo de cargo o la declaración de una persona sobre la que haya testificado un testigo de cargo. Esto es cónsono con el propósito de la vista preliminar californiana de establecer si existe causa probable para creer que el acusado cometió un delito grave. Se señala que la vista no debe utilizarse para propósitos de descubrimiento; tampoco con el propósito de compeler o autorizar la toma de deposiciones a los testigos (Sec. 866). Para la fecha en que se resuelve *Press-Enterprise II*, esta sección disponía que, finalizada la presentación de los testigos de cargo, los de defensa deberían ser juramentados y examinados.([11])

En California, al momento en que se decidió *Press-Enterprise II*, imperaba la norma de que las Reglas de Evidencia aplicaban a la vista preliminar.([12]) Así en el caso de

---

([11]) Sobre este particular véase *Jones v. Superior Court of San Bernardino County*, 94 Cal. Reptr. 289 (1971). La Sec. 866 del Código Penal de California fue enmendada en 1990 para añadirle todo lo relacionado con la oferta de prueba, el propósito de la vista preliminar y lo relativo a las deposiciones de los testigos.

([12]) En la actualidad el Código Penal de California, en el capítulo referente a la vista preliminar, únicamente excluye de la aplicación de dicho proceso, mediante disposición expresa al efecto, la Regla de la Mejor Evidencia. Así, la Sec. 872.5 establece que la Regla de la Mejor Evidencia no aplicará a las vistas preliminares.

*McDaniel v. Superior Court for County of San Diego*, 126 Cal. Reptr. 136, 137 (1976), se resolvió que:

> Sujeto al poder inherente del tribunal para ejercer control con relación a la presentación de evidencia y a las reglas que gobiernan la admisibilidad de evidencia, *Jennings*[13] compele al tribunal a permitir que la defensa presente su caso e interrogue testigos en la vista preliminar. (Traducción nuestra.)

Durante el transcurso de la vista preliminar el acusado no podrá ser interrogado a menos que esté representado por abogado o a menos que renuncie a este derecho luego de habérsele advertido en la vista sobre el mismo (Sec. 866.5). Con relación a los testigos se ha establecido que mientras se esté interrogando a alguno el magistrado podrá, mediante moción de cualquiera de las partes, excluir a cualquier testigo potencial o real que no haya sido examinado. Ordenará que los testigos no conversen entre sí y, de ser posible, que se mantengan separados unos de otros hasta que todos hayan sido examinados. Ciertas personas como el oficial investigador, algún investigador de la defensa o los oficiales encargados de custodiar personas traídas ante el magistrado, no serán excluidos de la sala. Cualquiera de las partes puede oponerse a la exclusión de algún testigo. Mediante moción a estos efectos de alguna de las partes, el magistrado deberá celebrar una vista, para récord, en la que determinará si la persona que se pretende excluir es, de hecho, excluible (Sec. 867).

Una de las secciones más relevantes a la discusión del caso de autos es la que dispone que la vista preliminar debe ser abierta y pública. Así lo ha sido desde su promulgación en 1872. No obstante lo anterior, a petición de la

---

En 1990, tanto la Constitución del estado de California como las reglas procesales, fueron enmendadas para proveer para la admisión de prueba de referencia en la vista preliminar.

[13] Se refiere al caso *Jennings v. Superior Court of Contra Costa County*, 59 Cal. Reptr. 440 (1967). En nuestra jurisdicción se ha dejado en *quaere* el asunto de si aplican o no las Reglas de Evidencia al proceso de vista preliminar. Véase *Pueblo v. Esteves Rosado*, 110 D.P.R. 334 (1980).

defensa y luego de una determinación por el magistrado de que la exclusión del público es necesaria para proteger el derecho del acusado a un juicio justo e imparcial, el magistrado deberá excluir de la vista a toda persona. Están exentos de ser excluidos el Fiscal y su asistente, el Procurador General, el Fiscal de distrito para el condado, el oficial investigador, el oficial de custodia o encargado de un prisionero que sea testigo mientras éste esté testificando, el acusado y su abogado, el oficial que tenga al acusado bajo su custodia y una persona escogida para el testigo de cargo que no sea a su vez testigo, pero que esté presente para proveerle apoyo moral a aquél, siempre y cuando se provea que la persona así escogida no podrá discutir, previo a o durante la celebración de la vista preliminar, el contenido del testimonio del testigo de cargo con ninguna persona que haya de ser testigo, excepto con el propio testigo a quien acompañe. Mediante moción de la fiscalía, miembros de la familia de la alegada víctima tendrán derecho a estar presentes y sentados durante la vista preliminar. Esta moción debe ser concedida a no ser que el magistrado encuentre que la exclusión es necesaria para proteger el derecho del acusado a un juicio justo e imparcial, o a menos que información provista por el acusado o recibida por el magistrado establezca que existe una posibilidad razonable (*reasonable likelihood*) de que la presencia de miembros de la familia de la alegada víctima representan un riesgo debido a que su presencia puede afectar el contenido del testimonio de la víctima o de cualquier otro testigo. El tribunal advertirá a estas personas que deberán abstenerse de discutir cualquier testimonio con otros miembros de la familia, testigos o con el público. Para efectos de lo aquí señalado, el término "miembros de la familia" incluirá al cónyuge de la alegada víctima, sus padres, tutor judicial, sus hijos o uno de ellos (Sec. 868).[14] La opción de

---

[14] La Sec. 868 del Código Penal de California fue enmendada en 1986 para proveer en cuanto a la presencia de los familiares de las víctimas y en 1988 para

celebrar la vista preliminar en privado no es exclusiva del acusado. El Fiscal la tiene a su disposición en algunas instancias.([15])

Como parte del proceso a seguirse con relación a los testigos que declaren en la vista preliminar, se ha establecido que, en casos de asesinato (*homicide*), el testimonio de todo testigo debe reducirse a escrito, como una deposición, por el magistrado o por otra persona bajo la dirección de aquél. En otros casos que no sean de asesinato se hará igual a petición del Fiscal, del acusado o de su abogado. En cualquiera de estas instancias, el magistrado ante quien se celebre la vista, a su discreción, ordenará que el testimonio y el procedimiento se transcriba taquigráficamente, para lo

---

eliminar cierta referencia, en su párrafo final, a la Sec. 867.

([15]) En 1990 se añadió la Sec. 859.1, la cual dispone que en casos de delitos sexuales donde la víctima es un menor de dieciséis (16) años de edad o menos, el tribunal, mediante moción del Fiscal, celebrará una vista para determinar si el proceso debe conducirse en privado con el fin de proteger la reputación del menor.

Con relación al asunto de la capacidad del Fiscal para solicitar que la vista preliminar se celebre en privado, la Sec. 868.7 del Código Penal de California, la cual entró en vigor el 1ro de enero de 1987, establece que, no obstante lo señalado en otras disposiciones de ley, el magistrado puede, *mediante moción del Fiscal*, cerrar la vista preliminar de la forma prevista en la Sec. 868 durante el testimonio de un testigo: (1) que sea menor de edad y la víctima querellada de un delito sexual y si su testimonio ante el público general tiene la posibilidad de causarle serio daño sicológico y no existen procedimientos alternos, incluyendo, pero no limitado a, deposición en cinta de vídeo o examen contemporáneo en otro lugar comunicado con la sala por medio de circuito cerrado de televisión, que pueda evitar el daño a percibirse; (2) cuya vida corra riesgo sustancial si aparece ante el público general y que no existan medidas alternas de seguridad, incluyendo, pero no limitado a, esfuerzos para esconder sus rasgos o descripción física, registro de los miembros del público presentes en la vista y la exclusión temporal de cualquier otro testigo real o potencial, que sean adecuadas para minimizar la amenaza a percibirse. Esta sección provee además para que, en todo caso donde el acceso del público a la sala se restrinja durante el examen de algún testigo de acuerdo con lo que en la misma se dispone, una transcripción del testimonio de ese testigo se haga disponible al público tan pronto como sea práctico hacerlo.

Cabe señalar, que en relación con los procesos por los delitos de incesto, violación, sodomía, seducción, actos lascivos e impúdicos y exposiciones deshonestas, o por la tentativa de cualquiera de éstos, la Regla 131 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, le permite al tribunal "excluir al público de la sala durante el tiempo que dure la declaración de la persona perjudicada admitiendo sólo a aquellas personas que tengan un interés legítimo en el caso, tales como los funcionarios del tribunal, abogados de las partes y familiares. Previo a la orden de exclusión el tribunal celebrará una vista en privado para determinar si la persona perjudicada necesita de esta protección durante su testimonio".

cual designará un taquígrafo. También, existe un minucioso proceso a seguir para autenticar una deposición o testimonio: (1) se debe identificar al testigo y ofrecer detalles de su residencia, lugar de trabajo y profesión; (2) hay que escribir las preguntas así como las respuestas, las cuales deben ser leídas mientras se escriben o corrigen, excepto cuando el testimonio se tome en taquigrafía no será necesario leerle sus respuestas al testigo; (3) en la transcripción se debe incluir toda pregunta hecha que sea objetada por cualquier parte y declarada improcedente, así como el fundamento por el cual se denegó la pregunta. Si el testigo se niega a contestar una pregunta, este hecho, así como la razón para la negativa, debe ser igualmente incluido en la transcripción; (4) el testigo debe firmar la deposición y, si se niega a firmar, debe ponerse por escrito la razón para tal negativa. Cuando se trate de taquigrafía no es necesaria la firma del testigo. El taquígrafo tiene diez (10) días, a partir de que se termine la vista preliminar, para transcribir sus notas (Sec. 869).

Las deposiciones tomadas en la vista o en la investigación serán conservadas por el magistrado o su secretario hasta que se envíen al tribunal correspondiente. No deberá permitir que nadie las examine o copie a excepción del juez del tribunal que tenga jurisdicción sobre el delito o que esté autorizado a expedir recursos de hábeas corpus, el Ministerio Público y el acusado o su abogado (Sec. 870).

Una vez haya culminado el proceso de desfile de prueba, si de la misma surge que no se ha cometido delito alguno o que no existe causa suficiente para creer que el acusado haya cometido el delito, el magistrado deberá ordenar la desestimación de la denuncia y la exoneración del acusado (Sec. 871). Cuando la denuncia sea así desestimada, por éstos u otros fundamentos,([16]) el Fiscal puede presentar

---

([16]) La Sec. 871 del Código Penal dispone para que el Fiscal acuda al tribunal superior a pedir la reinstalación de la denuncia cuando ésta, o parte de la misma, sea

moción al tribunal superior con el fin de compeler al magistrado a reinstalar la denuncia, o la parte de la misma que fuera desestimada, y reinstalar igualmente el estado de detención del acusado bajo los mismos términos y condiciones que cuando compareció por última vez ante el magistrado. Esta moción debe notificarse al acusado y al magistrado y su único fundamento debe ser que, como cuestión de derecho, el magistrado cometió error de derecho al desestimar la denuncia o parte de ella. El tribunal superior deberá oír y resolver la moción a base del récord de los procedimientos ante el magistrado de instancia. Si el Fiscal decide litigar la moción hasta su resolución final, estará impedido de instar nuevamente la acción desestimada o la parte de ésta que así lo fue. Si el tribunal superior se niega a reinstalar la denuncia o parte de ella, el Fiscal puede apelar de tal denegatoria.([17]) Por el contrario, si la moción para reinstalar es concedida, el acusado puede solicitar la revisión de tal resolución.([18]) Sec. 871.5.

La exposición y discusión que antecede, en torno a algunas de las secciones del Código Penal californiano referentes al proceso de vista preliminar, nos permite evaluar el alcance del señalamiento del Tribunal Supremo federal en cuanto a que el acceso del público a la vista preliminar, según ésta se lleva a cabo en California, juega un papel particularmente significativo en la forma en que el proceso funciona, ya que el tribunal fundamentó su conclusión en el hecho de que la vista preliminar en California era tan

---

desestimada de acuerdo con lo dispuesto en las Secs. 859b, 861, 871, 1008, 1381, 1381.5, 1385, 1387 ó 1389 del mismo código. Tiene quince (15) días para presentar la moción en que solicite la reinstalación, a partir de la fecha de la desestimación y exoneración.

([17]) La facultad para apelar se la concede el párrafo nueve (9) del inciso (a) de la Sec. 1238 del Código Penal de California.

([18]) En caso de ordenarse la reinstalación, la solicitud de revisión del imputado se instará de acuerdo con lo preceptuado en las Secs. 995 y 999a del Código Penal de California.

suficientemente parecida al juicio como para justificarla. *Press-Enterprise II*, pág. 12.

Procede, pues, que hagamos un análisis histórico del desarrollo del derecho procesal penal puertorriqueño para entonces poder comparar la vista preliminar de California con la de Puerto Rico y así poder determinar si la nuestra es parecida a la de California o lo suficientemente parecida a un juicio para justificar que, sin más, se le apliquen los criterios de *Press-Enterprise II*, en cuanto al derecho de acceso limitado de la prensa y el público al amparo de la Primera y Decimocuarta Enmiendas a la Constitución de Estados Unidos.

## V

*Desarrollo del Derecho Procesal Penal puertorriqueño*

El Derecho puertorriqueño se ha desarrollado de forma única, moldeándose a través de fuerzas externas que, unidas a un impulso interno de forjar nuestras leyes, quiere alcanzar la formación de un sistema autóctono ajustado a nuestra cultura, historia e idiosincrasia.[19] Es así que convergen dos (2) sistemas de derecho en nuestra isla, el civil y el derecho común de estirpe anglosajona (*common law*). Lo notable es cómo hemos tomado de ambos sistemas para crear uno propio, con características comunes pero mol-

---

[19] Así lo ha reconocido el Tribunal Supremo de Estados Unidos en reiteradas ocasiones. En *Fornaris v. Ridge Tool Co.*, 400 U.S. 41, 42–43 (1970), expresó:

"The relations of the federal courts to Puerto Rico have often raised delicate problems. *It is a Spanish-speaking Commonwealth with a set of laws still impregnated with the Spanish tradition.* Federal courts, reversing Puerto Rican courts, were inclined to construe Puerto Rican laws in the Anglo-Saxon tradition which often left little room for the overtones of Spanish culture. Out of that experience grew a pronouncement by this Court that a Puerto Rican court should not be overruled on its construction of local law unless it could be said to be 'inescapably wrong'." (Énfasis suplido.) Véanse, también: *Bonet v. Texas Co.*, 308 U.S. 463, 471 (1940); *Bonet v. Yabucoa Sugar Co.*, 306 U.S. 505 (1939).

deado y acoplado a nuestras necesidades, a nuestros valores y tradiciones, en fin, a nuestro pueblo.

Hacemos eco de las palabras de Gneist, según citadas por R.V. Pérez Marchand en *La justicia penal en Puerto Rico y su necesaria evolución*, III Rev. Jur. U.P.R. 96, 97 (1933), " 'ningún pueblo tiene un sentido innato de justicia; y que éste es el resultado de la influencia de sus costumbres y del ejercicio de repetidas experiencias' ". Esto equivale a decir que el fundamento de toda vida institucional está en las cualidades mentales y morales de un pueblo, como fuerzas acumuladas por la herencia. Íd., pág. 97. "El derecho es cultura y la cultura es experiencia histórica; tanto por ser cultura como por ser experiencia histórica el derecho está en transformación constante y no admite estratificaciones." E.J. Couture, *El porvenir de la codificación y del "common law" en el continente americano*, XVIII Rev. Jur. U.P.R. 1, 10 (1948).

El desarrollo del derecho procesal penal[20] se transformó durante el siglo XIX de un sistema inquisitorio a un sistema acusatorio. En el primero la rama judicial era parte de la ejecutiva y en los procesos el juez participaba activamente en la investigación llevando el peso de la acusación y la adjudicación del caso.

En 1888 se extendió a Puerto Rico la Ley de Enjuiciamiento Criminal de España de 1872, según enmendada en 1882. Esto respondió a un esfuerzo por uniformar el derecho peninsular y el ultramarino. Es con la aprobación

---

[20] El tema del desarrollo del derecho procesal penal ha sido discutido por los autores siguientes: D. Nevares-Muñiz, *Sumario de derecho procesal penal puertorriqueño*, 3ra ed. rev., Hato Rey, Ed. Inst. Desarrollo del Derecho, 1989; C. Delgado Cintrón, *Historia de la codificación penal en Puerto Rico*, VIII La Toga 30 (1975); E.A. Torres, *The Puerto Rico Penal Code of 1902–1915: A Case Study of American Legal Imperialism*, XLV (Núms. 3–4) Rev. Jur. U.P.R. 1 (1976); M. Rodríguez Ramos, *Breve historia de los códigos puertorriqueños*, XIX Rev. Jur. U.P.R. 233 (1950); R.V. Pérez Marchand, *La justicia penal en Puerto Rico y su necesaria evolución*, III Rev. Jur. U.P.R. 96 (1933); O.E. Resumil de Sanfilippo, *Derecho Procesal Penal*, Equity Publishing Co., 1990.

de esta ley que se cambia el sistema inquisitorial por el sistema acusatorio. Se introducen al sistema las innovaciones siguientes: juicio oral y público, separación de casos civiles y criminales en cuanto al tribunal sentenciador y jueces instructores, una instancia única en vez de los dos (2) grados de jurisdicción e intervención del acusado en todas las diligencias del sumario.

En 1891 se consolida la organización judicial mediante la Ley Orgánica del Poder Judicial de Ultramar, la cual dividió la Isla, para efectos judiciales, en distritos, partidas y términos municipales. También reorganizó el Ministerio Fiscal y relocalizó los límites jurisdiccionales de los tribunales existentes bajo la legislación anterior y creó otra Audiencia de lo Criminal. Esta Audiencia ejercía jurisdicción original sobre todos los delitos graves. El sumario, o investigación preliminar del delito, lo llevaba a cabo los juzgados de instrucción. Luego, esta investigación era remitida a la Audiencia de lo Criminal y a base de este documento y otras investigaciones que pudiese realizar, el Fiscal formulaba la acusación. De la determinación de la Audiencia podía apelarse a la Corte Suprema en Madrid. Esto en cuanto a la organización de los tribunales. En cuanto al proceso penal, la Dra. Dora Nevares-Muñiz nos lo explica, parcialmente, de la manera siguiente:

"En la orden de arresto, no se incluían los cargos; después del arresto el acusado era mantenido incomunicado e interrogado por el juez en privado. Luego de que el juez examinaba a los testigos, hacia el sumario del caso y lo remitía a la Audiencia para juicio. En este momento, el fiscal examinaba el sumario y se lo mostraba al abogado defensor. Los testigos de cargo declaraban primero, seguidos por los de la defensa. Los argumentos escritos de ambas partes concluían el caso y entonces el juez (o los Jueces) emitían el fallo e imponían la pena." D. Nevares-Muñiz, *Sumario de derecho procesal penal puertorriqueño*, 3ra ed. rev., Hato Rey, Ed. Inst. Desarrollo del Derecho, 1989, págs. 8–9.

■ Éste era, básicamente, el estado de derecho en Puerto Rico en el área procesal penal al momento de la invasión norteamericana.

Cuando empezó la invasión, el día 25 de julio de 1898, este pueblo se encontraba viviendo bajo un código de leyes que era el resultado final del progreso durante edades, y estaba profundamente arraigado en un sistema de jurisprudencia que le había sido concedido durante una docena de generaciones, desde el descubrimiento de América, y a sus antecesores, en España, por unos mil años con anterioridad a ese descubrimiento; un sistema que se derivaba del derecho romano, que ha estado en práctica en la península, por siglos, y traído desde allí, a esta colonia por los primeros pobladores.

Desde luego, con el advenimiento de los americanos, vinieron ideas distintas y el derecho vigente en los Estados Unidos, según surgiera de las instituciones anglo-sajonas, basado en el derecho común de Inglaterra, fué puesto en inmediato contacto con el derecho español, que regía en Puerto Rico. Mas no se verificaron cambios inmediatos hasta que tuvo lugar el establecimiento del Gobierno Civil, en el año 1900, por virtud de la ley Foraker, a excepción de aquellos ligeros cambios, pero necesarios, que se encuentran en las órdenes militares. *Ex parte Mauleón*, 4 D.P.R. 123, 134–135 (1903), opinión concurrente del Juez Asociado Señor MacLeary.

Al ocurrir el cambio de soberanía se dejó en vigor la Ley de Enjuiciamiento Criminal de España, con ciertas excepciones, a virtud de la Orden General Núm. 1 de 18 de octubre de 1898. Varias Órdenes Generales posteriores afectaron el procedimiento criminal, incluyendo la Orden General Núm. 118 de 16 de agosto de 1899, que estableció reglas de enjuiciamiento criminal.

Durante el gobierno militar, el Secretario de la Guerra de Estados Unidos nombró una Comisión Insular para hacer un estudio, investigación y recomendaciones relativas al bienestar de la Isla. En el informe emitido se sostuvo que el sistema de leyes y procedimiento español, aunque no malo del todo, difería tan radicalmente del americano en principio y estructura, así como en métodos y formas de práctica, que a su juicio la mejor forma de americanizar a

Puerto Rico era dándole el beneficio del sistema americano completo y no tratar de insertar reformas parciales al sistema español. Los miembros de la Comisión recomendaron que todas las leyes españolas, incluyendo los códigos vigentes, y todos los decretos reales aplicables a Puerto Rico fuesen derogados y que se adoptara el derecho común según aplicaba en los estados de la Unión. E.A. Torres, *The Puerto Rico Penal Code of 1902–1915: A Case Study of American Legal Imperialism*, XLV (Núms. 3–4) Rev. Jur. U.P.R. 1, 7–8 (1976).

El 12 de abril de 1900 se aprobó la Carta Orgánica conocida como la "Ley Foraker", la cual estableció un gobierno civil norteamericano en Puerto Rico. En su Art. 40 se autorizó la creación de la Comisión para Revisar y Compilar las Leyes de Puerto Rico. Esta comisión se reunió en varias ocasiones pero no completó su encomienda, aunque hizo una serie de recomendaciones. En su Informe al Congreso de Estados Unidos expresó:

"No cabe duda que fu[e] el propósito del Congreso armonizar las instituciones de la Isla con el sistema americano, haciendo esto, no obstante, sin repentinos cambios que pudieran ocasionar a los habitantes cargas y gastos, minando así su respeto por el Derecho. El esfuerzo que significaba el estudio de nuevos sistemas legales y su ajuste a la vida diaria recae en la comunidad con todo el vigor de una nueva e inesperada carga. Cualesquiera cambios violentos despertarán un espíritu de resistencia pasiva como impedimento a todo esfuerzo por americanizar la Isla. Debe tenerse en mente que la base de los códigos españoles es el Derecho Civil o Romano, el que, habiendo sido durante siglos el único sistema en los países de los cuales derivamos el Derecho Común, puede considerarse fuente de origen de este último, al cual ha prestado muchas de sus saludables reglas. *El sistema legal de Estados Unidos es completamente compatible con la preservación de instituciones que han resistido la prueba del tiempo y la experiencia en los países más avanzados de Europa y Sur-América.*

La Comisión se confrontó con un problema para el cual existían pocos precedentes en el Derecho Americano o el extranjero. Es cierto que en New México y California fuimos puestos en

contacto con el sistema español, pero fu[e] bajo circunstancias cuya historia no arroja luz para la situación en Puerto Rico. La Comisión no fue nombrada para barrer por completo con el sistema legal de la Isla, sino más bien para preservar las instituciones nativas que han dado evidencia de vigor y crecimiento, y para adaptarlas a los principios fundamentales del Derecho Americano .... Ajustándose a este plan, podrán resolverse las más apremiantes necesidades de la Isla, dejando que las subsiguientes reformas sean gradualmente establecidas por la Asamblea Legislativa de Puerto Rico." (Énfasis suplido y escolio omitido.) M. Rodríguez Ramos, *Breve historia de los códigos puertorriqueños,* 19 Rev. Jur. U.P.R. 233, 267 (1950).

A pesar de este lenguaje conciliador, el propósito de la Comisión Codificadora era la asimilación en las instituciones. El verdadero debate dentro de la Comisión no era sobre si se americanizaba o no a Puerto Rico, sino sobre el mejor modo de hacerlo. Entre las recomendaciones que hizo la Comisión fue la sustitución de tres (3) códigos: el Penal, el de Enjuiciamiento Criminal y el de Enjuiciamiento Civil. J. Trías Monge, *El choque de dos culturas jurídicas en Puerto Rico*, Equity Publishing Corp., 1991, págs. 90, 94

En enero de 1901, cuando se reúne la primera Asamblea Legislativa de Puerto Rico, se nombró una segunda Comisión Codificadora, compuesta por dos (2) norteamericanos y un (1) puertorriqueño. Esta comisión, contrario a la que autorizó el Acta Foraker, fue específicamente comisionada para codificar las leyes de Puerto Rico. La misma se conoció como la Comisión Rowe, por ser su presidente Leo S. Rowe. Estuvo compuesta por dos (2) miembros de la anterior, Rowe y el puertorriqueño Juan Hernández López. Preparó y sometió a la Asamblea Legislativa varios códigos, los cuales fueron convertidos en leyes de Puerto Rico, no empece a la oposición del único puertorriqueño miembro de la comisión.

El Código Penal y el Código de Enjuiciamiento Criminal fue-

ron formulados siguiendo como modelo el Código Criminal de California, y en verdad, en muchos artículos y capítulos parecen ser una copia exacta de aquella ley. Había una diferencia, sin embargo, y era la siguiente: Por razón de conveniencia, según se expresa en el informe que diera la comisión, el Código Penal de California, que comprende, en una sola ley, tres partes, que tratan respectivaménte de los delitos y castigos, del procedimiento criminal y de las prisiones o cárceles, fué dividido en dos códigos, que se denominaron, el Código Penal y el Código de Enjuiciamiento Criminal, siguiendo el método a que el pueblo estaba acostumbrado antiguamente, bajo la soberanía de España, cuando las leyes penales tenían aquellas denominaciones. *Ex parte Mauleón*, supra, pág. 136.

Estos códigos comenzaron a regir el 1ro de julio de 1902 y el objeto perseguido al aprobarlos era, sin duda alguna, sustituir todo el sistema español de leyes penales por un sistema americano completo. *Ex parte Mauleón*, supra, pág. 141.

¿Por qué se escogió el Código Penal de California? Porque los codificadores, en específico John M. Keedy, ya que éste estaba encargado de la presentación de los anteproyectos del Código Penal y de la Ley de Enjuiciamiento Criminal, consideraron que era un buen fundamento para las leyes puertorriqueñas ya que tenían en común la herencia española. Lamentablemente se equivocaron. En 1850 California se convirtió en estado, y si bien es cierto que hasta ese momento regia la ley española, su primera legislatura aprobó una ley derogando aquellas vigentes y otra ley adoptando el derecho común (*common law*) de Inglaterra como la ley del Estado. Así, pues, al transplantarse a Puerto Rico el Código Penal de California, éste era totalmente extraño al sistema hispano. El profesor Eulalio Torres cita un comentario al respecto: "No sé por qué Keedy escogió el Código Penal de California para esta Isla. Quizás pensó que era el código penal americano más cercano a una cultura hispánica —la de México. Igualmente hubiese podido escoger el Código Penal de Maine. Hubiese sido tan

extraño a esta cultura." (Traducción nuestra.) Torres, *supra*, pág. 34.[21]

Antonio Quintano Ripollés, en su obra *La influencia del Derecho Penal en las legislaciones hispanoamericanas*, Madrid, Eds. Cultura Hispánica, 1953, págs. 162–163, critica la manera en que se adoptó la versión californiana del Código Penal al decir que "no se respetó en él, como era de esperar, la tradición jurídica española, en que la isla viviera secularmente, ni siquiera en su gramática, constituyendo su texto la jeringonza más extravagante que se pueda imaginar. Parece ser unánime en los círculos científicos de Puerto Rico la opinión de abandonar un cuerpo legal tan exótico como anticuado, reintegrándose en fin a las tradiciones ideales de Derecho, moral y civilización que les son propias, según palabras de uno de sus juristas más calificados, el profesor de Derecho penal Santos P. Amadeo".

Con respecto a los esfuerzos oficiales de americanización masiva, en Puerto Rico se dio una curiosa variedad de opiniones. Entre los oponentes se encontraba José de Diego, el cual expresó:

A fines del año 1898, ocurrió en Puerto Rico el cambio de soberanía, cuando se hundió en el caribe [sic], como el naufragio de

---

[21] En la misma línea, también se ha cuestionado la conveniencia de adoptar leyes de otras jurisdicciones y, más aún, la práctica de importar estas leyes con la interpretación que se le da a las mismas en su lugar de origen. Dentro de esta práctica, es el legislador de la jurisdicción foránea quien está legislando para Puerto Rico, no con nuestros problemas sociales en mente, pero de conformidad con los problemas de su comunidad. M. Rodríguez Ramos, *Interaction of Civil Law and Anglo-American Law in the Legal Method in Puerto Rico*, XXIII Tulane L. Rev. 344, 365 (1949).

En Puerto Rico el proceso legislativo fue, desde los inicios del régimen de gobierno civil bajo Estados Unidos, agente señalado de cambio, pero cambio de impulso externo y dirección ajena a la tradición jurídica del país. La participación puertorriqueña en la formación de las leyes se reducía, esencialmente, al uso potencial del poder de veto que su dominio de la Cámara de Delegados le aseguraba frente al programa legislativo del elemento oficial. La orientación que se le imprimió al proceso legislativo no fue nueva. El rumbo asimilista emprendido se toma desde temprano en la época de la ocupación militar. J. Trías Monge, *El sistema judicial de Puerto Rico*, Río Piedras, Ed. Universitaria, 1978, págs. 68–69.

un sol, la bandera española, y a principios del año 1902, los Códigos de Montana y California sustituían a los de España, eran traducidos del inglés al castellano, eran impuestos por el conquistador a la obligada mansedumbre del pueblo conquistado.

Lo que pasó naturalmente en dos siglos, se pretendió aquí que pasara en dos años o lo que se elaboró por la continuidad de una transformación progresiva, se intentó aquí por la súbita fuerza del desplazamiento. Ahí está el hecho en apariencia realizado: los Códigos de California y Montana rigen en Puerto Rico, se ahorca por el procedimiento de Montana, se enjuicia por el procedimiento de California. Trías Monge, *op. cit.*, pág. 97.

En estos primeros años del siglo XX chocaron en Puerto Rico dos (2) randes sistemas de derecho, en muchas ocasiones con grandes críticas de los juristas puertorriqueños que veían la imposición de ciertas leyes como un absurdo. Muchas fueron las críticas, ya que no se respetaron tradiciones del derecho civil de la manera en que alegadamente se iba a hacer. Nuevamente se retrasa la creación de un sistema de derecho autóctono. No es sino al pasar de los años que se logra esto.

En 1917 se aprobó el Acta Jones, la cual rigió el sistema de gobierno de Puerto Rico hasta 1952. Esta incluyó una "Declaración de Derechos", en la cual se incorporaron todos los derechos individuales garantizados por la Constitución de Estados Unidos, excepto el juicio por jurado y la institución del gran jurado. En *Balzac v. Porto Rico*, 258 U.S. 298 (1922), el Tribunal Supremo federal decidió que no era aplicable a Puerto Rico la garantía a juicio por jurado consagrada en la Sexta Enmienda a la Constitución federal. El hecho de la exclusión en el Acta Jones de derecho a juicio por jurado respondió a que el Congreso estimó que al pueblo puertorriqueño, acostumbrado a un sistema de derecho que no tiene Jurado, que tiene costumbres formadas, se le debe permitir determinar cuándo y hasta dónde desean aceptar esta institución de origen

anglosajón. *Balzac v. Porto Rico,* supra, pág. 310. Desde 1900 hasta la aprobación del Acta Jones en 1917, Estados Unidos fue liberal al otorgarle a la isla la mayoría de las garantías constitucionales pero, a su vez, fue cuidadoso al evitar forzar el sistema de jurados a un país civilista, hasta que éste lo deseara. Íd., pág. 311. Cabe señalar que ya desde enero de 1901 se había aprobado la ley que establecía el juicio por jurado en Puerto Rico, aplicable sólo a ciertos casos criminales. En 1902, con la aprobación del nuevo Código de Enjuiciamiento Criminal, se incluyeron las disposiciones relativas al juicio por jurado. Sin embargo, el sistema de jurado no tuvo en Puerto Rico el éxito que se esperaba. B. Ortiz, *El derecho común como vehículo de expresión de nuestra cultura,* 5 Rev. Der. Leg. Jur. 133, 139 (1940). No fue si no hasta 1952, con la aprobación de la Constitución del Estado Libre Asociado, que se eleva a derecho constitucional el derecho de un acusado de delito grave a que su juicio se ventile ante un Jurado. En la Constitución federal, contrario a la nuestra, el derecho a juicio por jurado existe en todas las causas criminales. Por otro lado, en Puerto Rico nunca se ha reconocido este derecho en casos civiles ni en casos criminales por delitos menos graves.

El propósito de trazar la trayectoria de este derecho es destacar cómo una institución jurídica, anglosajona en origen, fue adaptada a nuestras necesidades particulares, teniendo, como dijéramos anteriormente, características comunes, pero ajustada y moldeada a nuestras circunstancias particulares.

> Los sistemas jurídicos no deben cerrarse a las aportaciones enriquecedoras de otras tradiciones. Tampoco deben abrirse al extremo de rendir su carácter. Los sistemas de derecho mixto viven en estado de tensión continua sobre el destino que les aguarda: o la absorción de una cultura por otra, o el descenso a una burundanga o batiburrillo jurídico, o la preservación y enanchamiento de las culturas que conviven en su medio y la

producción eventual de un derecho propio. Trías Monge, *op. cit.*, pág. 401.

Es ésta la perspectiva con que también debemos analizar el propósito que persigue nuestra vista preliminar. Esta es una institución jurídica también anglosajona en origen, cuyo concepto fue recientemente adoptado por nosotros para llenar ciertas necesidades de nuestro sistema procesal penal.

> El problema de Puerto Rico es uno de selección, eliminación y adaptación de normas jurídicas, desde el punto de vista de las necesidades peculiares de nuestra propia comunidad. ... Sin embargo, lo esencial es que no nos limitemos al proceso de adaptación. La mera imitación puede ser altamente perjudicial. Debemos estudiar los sistemas legales extranjeros desde el punto de vista de nuestro propio ambiente. Debemos crear, transformar, establecer nuevos principios y nuevos métodos jurídicos que se adapten a nuestro puertorriqueñismo sin que ello implique que debemos rechazar la influencia de sistemas foráneos de derecho. Nuestro deber, antes que nada, es el de determinar la realidad económica y social que ha producido el principio legal en un país extranjero y luego comprobar si tal postulado jurídico responde a las necesidades del ambiente puertorriqueño, o si la realidad insular exige la creación de un nuevo principio. Ortiz, *supra*, págs. 136–137.

Así, pues, en 1935 fue revisado el Código de Enjuiciamiento Criminal. Posteriormente, y cumpliendo con el Art. V, Sec. 6 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1,[22] adoptamos las Reglas de Procedimiento Criminal para el Tribunal General de Justicia, según sometidas a la Asamblea Legislativa y enmendadas,

---

[22] Este Art. dispone lo siguiente:

"El Tribunal Supremo adoptará, para los tribunales, reglas de evidencia y de procedimiento civil y criminal que no menoscaben, amplíen o modifiquen derechos sustantivos de las partes. Las reglas así adoptadas se remitirán a la Asamblea Legislativa al comienzo de su próxima sesión ordinaria y regirán sesenta días después de la terminación de dicha sesión, salvo desaprobación de la Asamblea Legislativa, la cual tendrá facultad, tanto en dicha sesión como posteriormente, para enmendar, derogar o complementar cualquiera de dichas reglas, mediante ley específica a tal efecto." Art. V, Sec. 6, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 357.

en 1963.(²³) A raíz de la aprobación de nuestra Constitución, se aprobó la Ley de la Judicatura en cuya Sec. 2 (4 L.P.R.A. sec. 2) se dispone que el Tribunal Supremo adoptará, *inter alia*, reglas de procedimiento criminal. Al entrar en vigor las Reglas de 1963 se derogó el Código de Enjuiciamiento Criminal en todo lo que fuera incompatible con las nuevas reglas.(²⁴)

Con este trasfondo, pasemos a analizar la vista preliminar en Puerto Rico.

## VI

*La vista preliminar en Puerto Rico*

■ La vista preliminar no estuvo presente en nuestro sistema procesal penal hasta pasada la primera mitad del presente siglo. A pesar de que a principios de siglo se adoptó para Puerto Rico un Código de Enjuiciamiento Criminal, prácticamente copiado del de California, se dejó fuera todo el articulado de dicho estado referente al procedimiento de vista preliminar. Tanto en California como en el sistema federal norteamericano y en Inglaterra, el proceso de vista preliminar similar al celebrado en California, prácticamente un "mini juicio", ha sido, como regla general, abierto al público. L.B. Orfield, *Criminal Procedure from Arrest to Appeal*, Nueva York, N.Y. University Press, 1947, Cap. II, págs. 87–88; *Press-Enterprise II.*

■ El mecanismo de la vista preliminar existe en Puerto Rico desde mediados de 1964, fecha en que entró en vigor la Regla 23 de Procedimiento Criminal, *supra.*(²⁵)

---

(²³) Estas aparecen en 34 L.P.R.A. Ap. II.

(²⁴) En 34 L.P.R.A. aparecen las disposiciones que quedaron en vigor.

(²⁵) La Regla 23 de Procedimiento Criminal, según enmendada, 34 L.P.R.A. Ap. II, dispone lo siguiente:

"(a) *Cuándo se celebrará.* Se celebrará una vista preliminar en aquel caso en que se imputare a una persona un delito grave (*felony*). En estos casos deberá citársele

Esta regla, sin embargo, se venía discutiendo ya desde 1958 cuando fue propuesta y analizada por el Comité de Procedimiento Criminal de la Conferencia Judicial de Puerto Rico en su Primera Sesión Plenaria. Al presentar su proyecto de Reglas de Procedimiento Criminal, el Comité recalcó las innovaciones del mismo, siendo una de ellas el mecanismo de la vista preliminar. Al hablar en torno al origen de la regla sobre la vista preliminar, el Lcdo. Francisco Ponsa Feliú, Presidente del Comité de Procedimiento Criminal, señaló que la misma provenía y es-

---

para esa vista [con] por lo menos cinco (5) días antes de su celebración. En los casos en que se hiciere constar, de acuerdo con la Regla 22(c), que la persona no puede obtener asistencia legal, el magistrado correspondiente le nombrará abogado y el nombre de éste se incluirá en la citación para la vista preliminar. El magistrado comunicará dicha vista al abogado.

"(b) *Renuncia.* Luego de haber sido citada, la persona podrá renunciar a la vista preliminar mediante escrito al efecto firmado por ella y sometido al magistrado antes de comenzar la vista o personalmente en cualquier momento durante la vista. Si la persona renunciare a la vista o no compareciere a ella luego de haber sido citada debidamente, el magistrado la detendrá para que responda por la comisión de un delito ante la sala correspondiente del Tribunal Superior.

"(c) *Procedimiento durante la vista.* Si la persona compareciere a la vista preliminar y no renunciare a ella, el magistrado deberá oír la prueba. *La vista será privada a menos que al comenzar la misma la persona solicitare que fuere pública.* La persona podrá contrainterrogar los testigos en su contra y ofrecer prueba en su favor. El fiscal podrá estar presente en la vista y podrá también interrogar y contrainterrogar a todos los testigos y ofrecer otra prueba. Al ser requerido para ello el fiscal pondrá a disposición de la persona las declaraciones juradas que tuviere en su poder de los testigos que haya puesto a declarar en la vista. Si a juicio del magistrado la prueba demostrare que existe causa probable para creer que se ha cometido un delito y que la persona lo cometió, el magistrado detendrá inmediatamente a la persona para que responda por la comisión de un delito ante la sección y sala correspondiente del Tribunal de Primera Instancia; de lo contrario exonerará a la persona y ordenará que sea puesta en libertad. El magistrado podrá mantener en libertad a la persona bajo la misma fianza, condiciones o ambas que le hubiere impuesto un magistrado al ser arrestada, alterar las mismas o imponer una fianza o condición de acuerdo con la Regla 218 (c) si ésta no se le hubiese impuesto, y si a juicio del magistrado ello fuere necesario. No obstante lo anterior el magistrado no podrá alterar la fianza fijada o condición impuesta por un magistrado de categoría superior, a menos que en la vista preliminar se determine causa probable por un delito inferior al que originalmente se le imputó a la persona. Después de que terminare el procedimiento ante él, el magistrado remitirá inmediatamente a la secretaría de la sección y sala correspondientes del Tribunal de Primera Instancia todo el expediente relacionado con dicho procedimiento, incluyendo cualquier fianza prestada. En el expediente se hará constar la fecha y el sitio de la vista preliminar, las personas que a ella comparecieron y la determinación del magistrado." (Énfasis suplido y en el original.)

taba "fundamentalmente inspirada" en la Regla federal,[26] "una Regla que, como todas las disposiciones Federales de procedimiento criminal, está concebida en términos generales, en términos amplios, en términos y conceptos abarcadores, sin el más mínimo esfuerzo por puntualizar o recurrir al detalle". *Memoria de la Primera Sesión Plenaria*, Conferencia Judicial de Puerto Rico, 11, 12 y 13 de diciembre de 1958, pág. 144. Al exponer sobre el contenido de nuestro proyecto de vista preliminar, el licenciado Ponsa Feliú expresó lo siguiente:

La vista preliminar, según podemos ver de la disposición (b) de la Regla 18, y de la disposición (c) de la Regla 18, es una en la cual el acusado tendrá derecho a estar representado por abogado, tendrá derecho a repreguntar testigos contrarios y a ofrecer testigos a su favor, y la misión del magistrado será, a base de la prueba que escuche, determinar la existencia de causa probable. Concepto conocido por todos y cuyo contenido jurídico, naturalmente, las Reglas no intentan definir, puesto que lo tiene ya a base de la doctrina jurisprudencial de existencia de causa probable. Luego, el fiscal, naturalmente, no vendrá obligado a ofrecer toda su prueba ni cosa que se parezca. Ofrecerá prueba suficiente para que, a base de esa prueba, el magistrado pueda hacer determinación afirmativa de causa probable. Si el magistrado hace determinación de causa probable y ése es el momento entonces en que, de acuerdo con la doctrina, estaría el acusado *held to answer*, detenido para responder, en ese momento, cuando el magistrado determina que hay causa probable, lo que hace, precisamente, es eso: detiene al acusado para responder ante el tribunal correspondiente. La Regla dice "co-

---

[26] De acuerdo con la ponencia del licenciado Ponsa Feliú, las "fuentes de origen" del Proyecto de Reglas de Procedimiento Criminal preparado por la Conferencia Judicial son las siguientes:

"Primero, el Código de Enjuiciamiento Criminal vigente. Segundo, las leyes de Puerto Rico que no están incorporadas actualmente en el Código de Procedimiento Criminal pero que tienen que ver con esa materia. Tercero, las Reglas Federales de Procedimiento Criminal. Cuarto, el Código Modelo del American Law Institute. Quinto, el Código Penal de California, en su parte procesal. Sexto, las Reglas de Enjuiciamiento Civil vigentes. Séptimo, un proyecto de Reglas de Procedimiento Criminal preparado y sometido por el Profesor Donnelly. Octavo, disposiciones originales de los miembros de la Comisión de Procedimiento Criminal." *Memoria de la Primera Sesión Plenaria*, Conferencia Judicial de Puerto Rico, 11, 12 y 13 de diciembre de 1958, págs. 140–141.

rrespondiente" porque, aunque no hay derecho a vista preliminar en un delito menos grave, pudiera darse el caso de que, imputado un delito grave que motiva la celebración de una vista preliminar, la determinación de causa probable que haga el magistrado sea solamente por un delito menos grave. En ese caso se detendría para responder al acusado, no ya ante la sección superior, sino ante la sección de distrito del Tribunal de Primera Instancia.

*No hay disposiciones que requieran que se tome taquigráficamente, ni específicamente de ningún otro modo, lo que ocurra en la vista preliminar.* Y no porque el asunto pasara inadvertido a los miembros del Comité —fue un asunto que se discutió ampliamente, y la decisión del Comité fue dejarlo en esa forma. El magistrado deberá, sin embargo, en una forma que la Regla no establece, dependiendo de los medios que tenga a su alcance— nada impediría que si tiene un taquígrafo a su alcance, o en un caso especial quiera usarse un taquígrafo, el magistrado lo use, pero no es indispensable —de acuerdo con los medios a su alcance podrá el magistrado y deberá el magistrado preparar el expediente del caso visto ante él y vendrá entonces obligado a remitirlo a la sección y sala correspondientes. Ese expediente, pues, en un caso excepcional podría consistir de la transcripción de las declaraciones; en otro caso podría consistir de declaraciones narrativas transcritas en maquinilla firmadas por el testigo o por los testigos; en otro caso podría consistir de las notas tomadas, manuscritas por el propio juez, firmadas por los testigos. Puede, en otras palabras, manifestarse en diferentes formas, dependiendo de las circunstancias del caso, de los medios disponibles, y de las necesidades de cada situación. Pareció al Comité que no era aconsejable establecer un método inflexible que exigiera determinado procedimiento para todos los casos, porque, ciertamente habría un gran número de casos que no justificarían el esfuerzo, el tiempo, y también habría situaciones en que quizás no habría medios disponibles para establecer esa clase de requisito en todos los tribunales de distrito de la Isla. Por esa razón se dejó en esa forma, sin un requisito específico sobre ese particular. Claro, que se podría hablar de la vista preliminar tanto y tanto que no voy a tratar de hablar nada más. Voy a señalar, sencillamente, esos puntos generales. Hay muchas otras cosas que habría que aclarar, pero que pueden ser objeto de aclaración en ocasión posterior." (Énfasis suplido y en el original.) *Memoria de la Primera Sesión Plenaria, supra,* págs. 144–145.

En su exposición sobre el proyecto de vista preliminar,

el licenciado Ponsa Feliú no hizo mención alguna acerca del carácter privado de la vista preliminar. En cuanto a las demás características por él mencionadas, la vista preliminar se ha ido desarrollando, con ciertas variaciones, tal y como fue proyectada.

Ha de notarse que nuestra vista preliminar es de origen estatutario. La misma no procede de disposición constitucional alguna. N. Frattallone Di Gangi, *La Vista Preliminar*, Año XVI (Núm. 63) Rev. Der. Purt. 231 (1977). Las vistas de esta naturaleza pueden ubicarse en dos (2) tipos o modelos con arreglo a su propósito o finalidad: el modelo de visión retrospectiva y el de visión prospectiva.

> Como este término sugiere, la preocupación primaria de la vista retrospectiva es con respecto a la legalidad del arresto y la validez de la detención. La pesquisa en la vista se manifiesta en la investigación hacia el pasado, al momento del arresto. Está diseñada para detectar detenciones ilegales de todas clases. Su interés se centra en una revisión de la legalidad de la detención. Se enfatiza el aspecto de la naturaleza preliminar no determinante ni final del procedimiento. El procedimiento no es un juicio sino un mecanismo inicial para cotejar la validez del arresto. El foro de la investigación se concentra mayormente en los hechos que dieron lugar al arresto, en contraste con la posible inocencia o culpabilidad del acusado desde el punto de vista jurídico.
>
> El modelo de visión prospectiva se orienta hacia el futuro: el juicio. El interés gira en cuanto a la probabilidad de culpabilidad o inocencia del acusado. Se destaca una preocupación por evitar o prevenir ulteriores procedimientos innecesarios. Por el papel central y más activo que juega el magistrado, se enfatiza su carácter más judicial, en contraste con el primer modelo señalado. Puede apreciar la credibilidad de testigos y debe estar dispuesto a desestimar los cargos de estimar insuficiente la prueba presentada por el Estado. Este último aspecto es fundamental en el modelo prospectivo. (Énfasis en el original suprimido.) *Pueblo v. Rodríguez Aponte*, 116 D.P.R. 653, 666–667 (1985).

En Puerto Rico hemos reconocido características de los dos (2) modelos a nuestra vista preliminar, por lo que es

más bien ecléctica aunque "[s]e aproxima tímidamente hacia la visión prospectiva". *Pueblo v. Rodríguez Aponte*, supra, pág. 667. Jurisprudencialmente hemos ido definiendo sus contornos de acuerdo con las dificultades que su aplicación ha presentado.[27]

En Puerto Rico es la determinación de causa probable en vista preliminar la que autoriza al Fiscal para que inicie la fase adjudicativa del proceso mediante la radicación del pliego acusatorio. La vista preliminar se concede únicamente en casos de delito grave y aunque el imputado puede renunciar a la celebración de la misma, para que sea aceptable, dicha renuncia tiene que ser hecha voluntaria e inteligentemente. Véanse: Regla 23(b) de Procedimiento Criminal, 34 L.P.R.A. Ap. II; *Pueblo v. Vélez Pumarejo*, 113 D.P.R. 349 (1982).

La vista preliminar ha sido definida como "una institución procesal de naturaleza estatutaria", O.E. Resumil de Sanfilippo, *Derecho Procesal Penal*, Equity Publishing Co., 1990, T. I, Cap. 15, pág. 371, cuyo propósito "es evitar que se someta a un ciudadano en forma arbitraria e injustificada a los rigores de un proceso criminal". *Pueblo v. López Camacho*, 98 D.P.R. 700, 702 (1970). "La vista brinda la oportunidad para que el ministerio fiscal demuestre que existe causa probable para creer que se ha cometido un delito y que la persona ante el juez instructor lo cometió. Una vez que esto queda demostrado, la vista ha cumplido su propósito de ley ...". *Pueblo v. López Camacho*, supra, pág. 702. En otras palabras, se habrá logrado "de-

---

[27] Legislativamente también ha sufrido cambios. Uno de los más notorios fue el introducido por la Ley Núm. 29 de 19 de junio de 1987 con el objetivo de limitar la celebración de la vista preliminar a ciertas situaciones en particular. Recientemente la Ley Núm. 26 de 8 de diciembre de 1990 enmendó nuevamente el inciso (a) de la Regla 23 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, con el propósito de restablecer el estado de derecho prevaleciente antes de entrar en vigor la Ley Núm. 29, *supra*; esto es, garantizar a los imputados de delito grave la celebración en todo momento de una vista preliminar.

terminar si es necesario celebrar un juicio plenario contra el imputado, con las gravosas consecuencias que ello conlleva tanto para éste como para el Estado". *Pueblo v. Rivera Alicea*, 125 D.P.R. 37, 41 (1989). Una vez el juez instructor se ha convencido de la existencia de causa probable puede, dentro de su facultad para reglamentar la presentación de prueba de la defensa, decidir no seguir escuchando prueba, o sea, no escuchar la prueba de la defensa.[28] Resumil de Sanfilippo, *op. cit.*, págs. 381, 385.

Desde sus inicios, en nuestra jurisdicción, distinto a la de California, la vista preliminar ha gozado de un carácter privado por disposición expresa de la propia regla que le dio vida procesal. Regla 23(c) de Procedimiento Criminal, *supra.* Mediante nota al calce al efecto, señalamos en *Pueblo v. Rodríguez Aponte*, supra, pág. 665 esc. 3, que este carácter privado de la vista preliminar "tiende a minimizar el impacto negativo publicitario de quien es finalmente exonerado".

Una vez se decide celebrar la vista preliminar, para que el magistrado que preside la misma pueda ordenar la detención del imputado de delito, la prueba debe demostrar que existe causa probable para creer que se cometió un delito y que el imputado fue su autor. *Vázquez Rosado v. Tribunal Superior*, 100 D.P.R. 592 (1972). Esto es: "A la luz de los elementos del delito imputado el juzgador debe determinar si tal prueba establece la *probabilidad* de que están presentes *todos* los elementos, a saber, la probabilidad de que se haya cometido tal delito imputado. Concomitante a dicho examen, debe determinar si hay prueba que probablemente conecte al imputado con el delito probablemente cometido." (Énfasis en el original suprimido y énfasis suplido.) *Pueblo v. Rivera Alicea*, supra, pág. 43. Para probar la existencia de causa probable el

---

[28] Véase *Pueblo v. Cruz Bayona*, 124 D.P.R. 568 (1989).

Fiscal no viene obligado a presentar toda la prueba de que dispone. No tiene que probar la culpabilidad del acusado más allá de toda duda razonable. *Pueblo v. Figueroa Castro*, 102 D.P.R. 279, 284 (1974). Por su naturaleza, en la vista preliminar "la credibilidad de los testigos, está supeditada al *quantum* de la prueba requerida en esta etapa ...". *Pueblo v. Rodríguez Aponte*, supra, pág. 664. La vista preliminar no es ni debe convertirse en un "mini-juicio"; todo lo que se requiere para determinar que existe causa probable es una prueba que establezca, prima facie, que probablemente se cometió el delito y que el imputado fue el que probablemente lo cometió. Una vez el Fiscal demuestre esto, el juez instructor no tiene que continuar escuchando prueba.

Por su parte, el imputado de delito tiene un derecho, limitado por la discreción del magistrado, a contrainterrogar a los testigos de cargo e, incluso, a presentar prueba de defensa que derrote la probabilidad de su vinculación con el delito como autor del mismo. *Pueblo v. Vélez Pumarejo*, supra. En *Pueblo v. Rodríguez Aponte*, supra, señalamos que a un imputado no le asiste un derecho absoluto de poder interrogar los testigos de cargo en una etapa anterior al juicio en su fondo como lo es la vista preliminar. Apuntamos allí que "[c]on anterioridad al juicio, el derecho del imputado a interrogar o entrevistar los testigos de cargo está circunscrito a sólo la voluntad de los testigos". *Pueblo v. Rodríguez Aponte*, supra, pág. 660.

En *Hernández Ortega v. Tribunal Superior*, 102 D.P.R. 765, 769 (1974), decidimos que no existía "razón en nuestro ordenamiento jurídico para prohibir judicialmente el planteamiento de la defensa de locura en ocasión de la vista preliminar". Cónsono con la naturaleza investigativa judicial de dicha vista, resolvimos que "[e]l juez no tiene que adjudicar finalmente si la defensa afirmativa prevalecerá o no eventualmente, fuera de toda duda [razonable],

en la vista en su fondo de estos casos. *Su función es estrictamente aquilatar la razonabilidad de exponer a una persona a quien se le imputa un delito a los rigores de un juicio criminal"*. (Énfasis suplido.) Íd. Como podrá observarse, en nuestra vista preliminar el imputado puede presentar la defensa de insanidad mental o "locura", pero sin que ello conlleve convertir la vista en un juicio separado para dirimir en su fondo la incapacidad mental del imputado cuando haya prueba que no sea clara o prueba pericial contradictoria. *Pueblo v. Lebrón Lebrón*, supra. En cuanto a si puede presentarse igualmente una moción de supresión de evidencia, nada hemos expresado.

Debido a que, en su función básica, la vista preliminar se limita a la determinación de si existe o no causa probable para creer que se ha cometido un delito y que el mismo se cometió por el imputado, y no la culpabilidad o inocencia de éste, el Fiscal sólo viene obligado a presentar aquella prueba que por lo menos establezca un caso prima facie en contra del imputado. *Pueblo v. Rodríguez Aponte*, supra. Si la prueba presentada no demuestra la probabilidad de que se haya cometido el delito y la probabilidad de que el imputado lo cometiera, el magistrado está en la obligación de exonerarlo y ordenar su libertad, con sujeción a los trámites ulteriores posibles. Véanse: *Pueblo v. Félix Avilés*, 128 D.P.R. 468 (1991); *Pueblo v. Méndez Pérez*, 120 D.P.R. 137 (1987); *Pueblo v. Rivera Colón*, 119 D.P.R. 315 (1987); *Pueblo v. Báez Molina*, 129 D.P.R. 663 (1991). Si se determina que existe causa probable, el Ministerio Público queda facultado a presentar el pliego acusatorio contra el imputado, aunque no está obligado a hacerlo. Regla 24(b) de Procedimiento Criminal, 34 L.P.R.A. Ap. II.

La determinación de no causa en nuestra vista preliminar no pone fin al tracto procesal investigativo judicial. Si el imputado es exonerado o si el magistrado

encuentra causa probable para acusarlo por un delito distinto o menor incluido en el delito imputado, el Fiscal puede acudir a un magistrado de mayor jerarquía, dentro del Tribunal de Primera Instancia, para que éste determine causa probable para acusar por el delito imputado. Véanse: Regla 24(c) de Procedimiento Criminal, 34 L.P.R.A. Ap. II; *Álvarez v. Tribunal Superior*, 102 D.P.R. 236 (1974); *Pueblo v. Figueroa Castro*, 102 D.P.R. 279 (1974); Nevares-Muñiz, *op. cit.*, pág. 89. El Fiscal puede continuar su investigación y en esta nueva vista de causa probable, llamada vista preliminar en alzada, puede presentar la misma prueba que trajo antes o puede desfilar prueba distinta si así lo cree conveniente. Regla 24(c), *supra*. La vista preliminar en alzada no es considerada una apelación de la vista inicial. Es una vista independiente, separada y distinta. La determinación en los méritos que en ella se tome sobre la existencia o no de causa probable será final y no es revisable. Sólo podrá revisarse, mediante el recurso de *certiorari*, cualquier otra determinación estrictamente de derecho que allí se tome. *Pueblo v. Cruz Justiniano*, 116 D.P.R. 28 (1984).

Si recae una determinación afirmativa de causa probable, el Fiscal tiene discreción para proseguir o no con el proceso. Si decide continuar incoará la acusación. Una vez el Fiscal presenta la acusación, y al momento de hacer alegación o antes de alegar, el acusado puede presentar a su vez una moción de desestimación al amparo de la Regla 64 (p) de Procedimiento Criminal, 34 L.P.R.A. Ap. II. Véase *Pueblo v. Mena Peraza*, 113 D.P.R. 275 (1982). Al presentarse esta moción hay que alegar los fundamentos para la misma, de tal forma que el imputado pueda mover la discreción del tribunal para que ordene una vista en la cual tenga la oportunidad de demostrar que la determinación de causa probable para acusar no fue hecha con arreglo a

la ley y a derecho. Véanse: Regla 64(p), *supra; Vázquez Rosado v. Tribunal Superior*, supra; *Pueblo v. González Pagán*, 120 D.P.R. 684 (1988); *Pueblo v. Rivera Alicea*, supra.

 La decisión tomada por el magistrado en vista preliminar goza de una presunción legal de corrección. *Pueblo v. Tribunal Superior*, 104 D.P.R. 454 (1975). Esto obedece a que, al tomar su determinación, el magistrado actúa entre las partes como juez y no como parte interesada. Véanse: *Pueblo v. Opio Opio*, 104 D.P.R. 165, 171 (1975); *Pueblo v. Padilla Flores*, 127 D.P.R. 698 (1991).

Lo antes expuesto resume el contenido, el carácter y la finalidad de nuestra vista preliminar. Nos corresponde ahora comparar la vista preliminar celebrada en el estado de California con la nuestra.

## VII

*Comparación de la vista preliminar celebrada en California con el proceso de vista preliminar en Puerto Rico*

 El proceso de vista preliminar está garantizado, tanto en Puerto Rico como en California, a toda persona a quien se le impute la comisión de un delito grave.[29] El propósito de la vista preliminar californiana es establecer si existe causa probable para creer que el acusado cometió un delito grave. West's Ann.Cal.Penal Code Sec. 866. De otra parte, el propósito de nuestra vista preliminar es brindarle al Ministerio Público la oportunidad para que "demuestre que existe causa probable para creer que se ha cometido un delito y que la persona ante el juez instructor lo cometió". *Pueblo v. López Camacho*, supra, pág. 702. O sea, que el Estado demuestre con una "scintilla" de prueba

---

[29] El ordenamiento californiano dispone para la celebración de vista preliminar a toda persona a quien se le impute un delito para el cual tenga jurisdicción el tribunal superior del mencionado estado. West's Ann.Cal.Penal Code Sec. 859b.

que se justifica que el proceso pase de la fase investigativa judicial a la fase adjudicativa mediante la presentación del pliego acusatorio.

En California la vista preliminar se lleva a cabo luego de la lectura de los cargos (*arraignment*—Sec. 859b); mientras que en Puerto Rico es precisamente la determinación de causa probable, luego de celebrada la vista preliminar, la que autoriza al Ministerio Público a presentar el pliego acusatorio. En ambos procesos la persona tiene derecho a estar asistido de abogado,[30] contrainterrogar a los testigos en su contra y ofrecer prueba en su favor. El Fiscal también puede interrogar y contrainterrogar a todos los testigos. En Puerto Rico, una vez lo requiera el imputado, el Fiscal debe poner a su disposición las declaraciones juradas que tenga en su poder de aquellos testigos que haya puesto a declarar en la vista. En California, una vez comparezca el abogado del acusado o cuando se determine que éste puede representarse a sí mismo, el Fiscal debe entregarle o poner a su disposición copia del informe de delitos y arrestos preparado por la policía. Además, una vez comenzada la vista, el acusado tiene derecho a que el magistrado le lea las deposiciones de los testigos examinados durante la investigación.

En esencia, las instancias antes mencionadas son puntos de coincidencias entre nuestra vista preliminar y la celebrada en California. Sin embargo, aún en esos puntos de aparente coincidencia existen distinciones que es importante resaltar.

En cuanto al derecho del imputado a presentar prueba en su favor, hemos establecido que el mismo "no es

---

[30] En California el acusado tiene derecho a comparecer personalmente a la vista cuando el tribunal determine que así puede hacerlo. En Puerto Rico la Regla 23 (a) de Procedimiento Criminal, *supra*, establece, en lo pertinente, que: "En los casos en que se hiciere constar ... que la persona no puede obtener asistencia legal, el magistrado correspondiente le nombrará abogado ...."

irrestricto". Debido al "carácter limitado de la vista preliminar", una vez el Ministerio Público haya presentado prueba suficiente para cumplir con el *quantum* requerido para determinar la existencia prima facie de causa probable para acusar, el imputado no tiene derecho a presentar e interrogar como testigos suyos unos testigos anunciados pero no presentados por el Ministerio Público. *Pueblo v. Rodríguez Aponte*, supra.[31] Esta determinación es cónsona con nuestro señalamiento de que la vista preliminar "no es ni debe convertirse en un 'minijuicio' o juicio preliminar". *Pueblo v. Rodríguez Aponte*, supra, págs. 667–668.[32]

Por el contrario, en 1986, al momento de emitirse la opinión de *Press-Enterprise II*, el ordenamiento californiano establecía expresamente que, una vez terminada la

---

[31] En *Pueblo v. Rodríguez Aponte*, 116 D.P.R. 653 (1985), la defensa solicitó del Tribunal de Distrito que se citara a once (11) testigos, de los cuales diez (10) aparecían al dorso de las denuncias como testigos de cargo. El tribunal accedió a dicha solicitud.

[32] No obstante lo anterior, también expresamos que:

"[E]n casos apropiados los magistrados en la vista preliminar están facultados discrecionalmente para atender cualquier reclamo genuino de un imputado, basado en que determinado testigo de cargo puede aportar evidencia que excluiría la determinación de causa probable. Ello es función inherentemente judicial. Ni la visión más limitada como tampoco la más abarcadora de vista preliminar es óbice para una determinación remedial si el Ministerio Público ha actuado con mala fe al anunciar como suyo un testigo que, a sabiendas, sólo podría beneficiar a la defensa.

"Esta prerrogativa debe estar precedida de una ponderada reflexión según el contexto de cada caso. Su ejercicio está condicionado. A tal efecto, cuando en la vista preliminar un imputado reclame un testigo consignado al dorso de la denuncia como testigo de cargo, deberá hacer una demostración prima facie de que ese testigo puede aportar prueba exculpatoria que razonablemente y con toda probabilidad, derrotaría la estimación de causa probable para acusar. *Cf. Pueblo v. Cancel Hernández*, 111 D.P.R. 625 (1981). No basta una simple alegación. '[E]l acusado no tiene derecho a una expedición de pesca en los archivos de fiscalía.' *Pueblo v. Romero Rodríguez*, 112 D.P.R. 437 (1982). Hecha esa demostración, corresponderá entonces al magistrado examinar en ausencia de las partes la declaración jurada de ese testigo. Más que simples contradicciones u omisiones no esenciales —cuestiones que corresponden propiamente al proceso de dirimir credibilidad en el juicio en su fondo— el examen versará sobre los elementos del delito y las probabilidades de que el imputado lo cometió. Si en efecto, con ese examen queda convencido de que el testigo de cargo podría aportar prueba que exonere al imputado, por excepción, ordenará que preste testimonio. De no mediar esa circunstancia, el magistrado declarará sin lugar el pedido de la defensa de usar los testigos de cargo." *Pueblo v. Rodríguez Aponte*, supra, págs. 669–670.

presentación de los testigos de cargo, todo testigo presentado por la defensa debía ser juramentado y examinado. West's Ann.Cal.Penal Code Sec. 866.([33])

Otro elemento de distinción en asuntos aparentemente similares en ambas vistas lo es el derecho del imputado a recibir copia de las declaraciones juradas de los testigos de cargo. En nuestra jurisdicción prevalece la norma que establece que el Fiscal pondrá a disposición del imputado las declaraciones juradas de los testigos de cargo que hayan declarado en la vista preliminar. Ahora bien, no sólo son las declaraciones de los testigos que hayan declarado en la vista sino que, además, serán aquellas que tenga en su poder y sólo cuando el imputado así lo requiera. Regla 23(c) de Procedimiento Criminal, *supra*. En California, por el contrario, el ordenamiento dispone que al comenzar la vista preliminar el magistrado deberá leerle al acusado las deposiciones de los testigos examinados durante la investigación. West's Ann.Cal.Penal Code Sec. 864.

En California, al momento de decidirse *Press-Enterprise II*, las Reglas de Evidencia aplicaban a la vista preliminar. *McDaniel v. Superior Court for County of San Diego*, supra. En nuestra jurisdicción no hemos entendido necesario pasar juicio en torno al asunto de si las Reglas de Evi-

---

([33]) No es hasta 1990 que, mediante enmienda, se introdujeron cambios a la Sec. 866. En su redacción actual esta sección establece que cuando el acusado presente sus testigos, *a petición del Fiscal*, el magistrado habrá de requerir una oferta de prueba con relación al testimonio esperado por dichos testigos. El magistrado no permitirá ningún testigo a menos que la oferta de prueba demuestre que el testimonio tendría la probabilidad razonable de establecer una defensa afirmativa, negar algún elemento del delito imputado o impugnar el testimonio de algún testigo de cargo. Nótese que en California, luego de la enmienda, se dispone que todo testigo presentado por la defensa debe ser juramentado y examinado y, sólo si el Fiscal lo requiere, el magistrado requerirá una oferta de prueba con relación al testimonio de dichos testigos. En nuestra jurisdicción no todo testigo presentado por el imputado será examinado. Hemos resuelto que el imputado no tiene derecho a presentar como testigos suyos los testigos de cargo no presentados por el Fiscal. Estos serán admitidos *discrecionalmente y sólo por excepción*, luego de que el magistrado examine la declaración jurada de esos testigos cuando el imputado haga un "reclamo genuino" de que el testigo de cargo aportaría prueba que excluiría la determinación de causa probable. *Pueblo v. Rodríguez Aponte*, supra.

dencia deberían aplicar o no al procedimiento seguido en la vista preliminar. Ese punto no ha sido resuelto. *Pueblo v. Esteves Rosado*, 110 D.P.R. 334 (1980). Sobre la aplicación de las Reglas de Evidencia a nuestra vista preliminar, la profesora Resumil nos indica que "[l]a naturaleza de la vista preliminar limita su aplicabilidad en cuanto se trata de un procedimiento de naturaleza investigativa. No se trata de dirimir credibilidad en el juicio de responsabilidad sino con relación al establecimiento de una relación causal-fáctica entre la conducta del imputado, y la verificación de los elementos del delito". Resumil de Sanfilippo, *op. cit.*, pág. 384.

Otro aspecto disímil a resaltar, también presente al decidirse *Press-Enterprise II*, es el procedimiento seguido en ambas jurisdicciones cuando en la vista preliminar se determina que no existe causa probable para acusar. Luego de una determinación de no causa, tanto aquí como en California el magistrado debe exonerar y poner en libertad al acusado. Véanse: Regla 23(c) de Procedimiento Criminal, *supra*; West's Ann.Cal.Penal Code Sec. 871. En California, sin embargo, el Fiscal no puede continuar su investigación, sólo se le permite revisar cuestiones de derecho. Ahora bien, cuando en nuestra jurisdicción recae una determinación de no causa, por virtud de lo dispuesto en la Regla 24(c) de Procedimiento Criminal, *supra*, el Fiscal puede continuar investigando y está autorizado a presentar el asunto de nuevo con la misma prueba o prueba distinta ante un magistrado de categoría superior del Tribunal de Primera Instancia. Como anteriormente expresamos, la vista preliminar en alzada es un procedimiento independiente, separado y distinto del procedimiento inicial. *Pueblo v. Cruz Justiniano*, supra; *Pueblo v. Tribunal Superior*, 96 D.P.R. 237 (1968). Si en la vista preliminar en alzada recae nuevamente una determinación de inexistencia de causa probable para acusar, el Fiscal no

podrá solicitar revisión de la decisión en los méritos allí tomada y estará impedido de presentar la acusación en contra del imputado. Como indicamos al discutir el proceso de vista preliminar en Puerto Rico, sólo podrá solicitar que se revise, mediante el recurso de *certiorari*, las determinaciones de derecho hechas en la vista en alzada. *Pueblo v. Cruz Justiniano*, supra.[34] Por otro lado, si luego de la vista preliminar recae una determinación de causa probable el Fiscal está autorizado, a su discreción, a proseguir a la fase adjudicativa mediante la presentación del pliego acusatorio. En California, por el contrario, se prosigue inmediatamente al juicio en su fondo, pues ya ha habido una lectura de los cargos.

En California, una vez el magistrado determina que no existe causa y desestima la denuncia, el Fiscal puede acudir ante el tribunal superior para solicitar que se ordene la reinstalación de la denuncia. Dicha solicitud tendrá como fundamento exclusivo el que, como cuestión de derecho, el magistrado erróneamente desestimó los cargos. Así se explica el requisito de registrar detalladamente los procedimientos llevados a cabo en la vista original. *People v. Salzman*, 182 Cal. Reptr. 748 (1982). Contrario a lo que sucede en nuestra jurisdicción, el Fiscal californiano no puede

---

[34] Con relación a los efectos de la determinación que se haga en una vista preliminar en alzada, la profesora Resumil hace la crítica siguiente:

"[M]ilita en contra de la aplicación del impedimento para reprocesar el hecho de que el grado de prueba necesario para la determinación de causa probable no requiere que el Ministerio Público descubra toda la prueba de que dispone a los efectos de sostener la imputación en vista preliminar. Ello, conjuntamente con el hecho de que el descubrimiento de prueba no tiene lugar hasta luego de radicado el pliego acusatorio, podría mantener fuera del alcance del Estado prueba inculpatoria que, obtenida posteriormente, estaría impedido de presentar permaneciendo impune el delito por causa del impedimento para reprocesar.

"Como vemos, no debe imponerse una sanción de este tipo contra el Estado, perjudicando su función procesal. Debe definirse por vía legislativa el alcance de la determinación negativa en alzada, garantizando los derechos de los acusados sin imponer una pesada carga al Estado que impida reiniciar procedimientos que sólo permanecieron en fase de investigación." Resumil de Sanfilippo, *op. cit.*, págs. 394–395.

acudir en alzada para solicitar una vista preliminar nueva, distinta, independiente.

En California, si el tribunal superior confirma al magistrado y se niega a reinstalar la denuncia, el Fiscal está facultado a apelar de esa determinación. Si, por el contrario, el tribunal declara con lugar la moción de reinstalación de los cargos y como resultado se detiene al acusado para responder, éste puede solicitar la revisión de esa determinación. West's Ann.Cal.Penal Code Sec. 871.5. Para la apelación o revisión, según sea el caso, pueden acudir a la Corte de Apelaciones de California. *Cal. Rules of Court, State*, Cap. I, Parte I (ed. rev. 1990). Si se concede la reinstalación el acusado también puede optar por, en vez de resumir los procedimientos ante el magistrado, renunciar a ese derecho y consentir a la presentación de un pliego acusatorio reinstalando los cargos.

De otra parte, en California, si el magistrado determina que existe causa probable, el próximo paso es la vista en su fondo. Bajo nuestro sistema, si finalizada la vista preliminar en alzada el tribunal determina que existe causa probable, el Fiscal aún tiene discreción para presentar o no acusación.

Hemos discutido instancias específicas que demuestran algunas de las diferencias más notables que existen entre la vista preliminar californiana y la nuestra. Un examen del proceso de vista preliminar en California que reseñamos en la parte III de esta opinión nos muestra otras diferencias entre ambas vistas. Como ejemplo podemos destacar el detallado proceso a seguir cuando se trata el tema de los testigos y los aspectos relacionados con su presentación, protección y exclusión, entre otros.

Lo anterior nos mueve a concluir que nuestra vista preliminar, contraria a la celebrada en California, es un procedimiento limitado, de naturaleza investigativa judicial, que no se asemeja lo suficiente a un juicio como para que le sea aplicable lo resuelto en *Press-Enterprise II.*

## VIII

*La naturaleza particular de nuestra vista preliminar con arreglo a nuestro sistema de derecho —la experiencia y la lógica y el derecho de acceso limitado de la prensa y el público a la vista preliminar*

Habiendo establecido que *Press-Enterprise II* no aplica a Puerto Rico, por no ser la vista preliminar nuestra similar a la de California, ni suficientemente parecida a un juicio, nos toca ahora determinar si utilizando el análisis de la experiencia y la lógica, tomando en consideración el procedimiento y el sitio en que ésta se conduce, la prensa y el público tienen un derecho de Primera Enmienda de acceso limitado a la vista preliminar.

En *Gannett*, págs. 377–388, el Tribunal Supremo federal reconoció que, con relación a los procedimientos anteriores al juicio, no existía evidencia persuasiva de la existencia de un derecho de carácter consuetudinario (*at common law*) a que los miembros del público tuvieran un derecho a asistir a los mismos. Estos procedimientos, precisamente para proteger el derecho a un juicio justo, nunca se caracterizaron por el mismo grado de apertura al público que el juicio en sí. En Puerto Rico la historia demuestra que los procedimientos de la etapa investigativa penal tampoco eran abiertos al público.

El análisis de la experiencia no es otra cosa que un análisis histórico del proceso bajo estudio. Como expresamos anteriormente en la parte V de esta opinión, el derecho procesal penal puertorriqueño históricamente se ha desarrollado de una manera muy particular debido a la influencia del derecho civil y el consuetudinario angloamericano. Específicamente con relación a la vista preliminar debemos apuntar que aunque ésta tiene una corta tradición, ya que entró en vigor a mediados de 1964, tuvo como trasfondo y se nutrió de un proceso de análisis de varios siste-

mas de derecho que nos llevó a la aprobación de una de las constituciones más de avanzada en el mundo moderno, adaptada a nuestras necesidades culturales y realidad histórica.

Con relación al mecanismo procesal bajo estudio, proveniente éste del derecho consuetudinario angloamericano (*common law*), sólo adoptamos el concepto básico de vista preliminar. La característica de cerrada que la diferenciaba del juicio en sí, se la incorporamos para hacerla más afín con nuestro derecho procesal penal y constitucional, que consagra específicamente la inviolabilidad de la dignidad del ser humano y el derecho de toda persona a protección contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar. Art. 2, Secs. 1 y 8, Const. E.L.A., L.P.R.A., Tomo 1.

La naturaleza y contornos de la vista preliminar los hemos ido delineando a la luz de nuestra realidad jurídica e idiosincrasia de pueblo. Los linderos actuales de la misma son el producto de interpretaciones jurisprudenciales nutridas por la experiencia y el acervo jurídico legado por nuestra tradición civilista, los constituyentes y demás estudiosos del derecho. Verdaderamente, la historia refleja que el acceso del público a la vista preliminar en Puerto Rico no ha jugado un papel significativo en su funcionamiento y desarrollo.

▮▮ El derecho procesal penal se ha definido así: "Area del derecho público constituida por el conjunto de disposiciones estatutarias y decisiones jurisprudenciales, cuyo propósito es regular el proceso mediante el cual el Estado *identifica, enjuicia y penaliza* a la persona que ha cometido un delito. Incluye, pues, el estudio de la organización, funciones y procedimientos con que el Estado cumple los fines de la justicia. De ahí que su objeto primario sea canalizar la tramitación justa de las controversias de naturaleza penal." (Énfasis suplido.) Nevares-Muñiz, *op. cit.*, pág. 1.

El proceso penal se divide propiamente en tres (3) fases: (1) la etapa investigativa judicial, en la cual el Estado identifica el delito y la persona que probablemente lo cometió; (2) la etapa adjudicativa en sí, con todos los procedimientos aledaños a la misma, en la cual el Estado enjuicia, y (3) los procedimientos posteriores a la sentencia en las cuales el Estado penaliza.[35]

La fase investigativa o de instrucción "[i]ncluye desde la investigación inmediata en el lugar de los hechos hasta la formulación de cargos y el arresto que da inicio a la acción penal". Nevares-Muñiz, *op. cit.*, pág. 4. En los casos de delito grave[36] "[la] etapa investigativa culmina con una vista de causa probable para acusar". Resumil de Sanfilippo, *op. cit.*, pág. 369.

La profesora Resumil clasifica la vista preliminar como un mecanismo investigativo judicial que tiene el propósito de determinar "con mayor probabilidad la conexión del imputado con la comisión del delito". Resumil de Sanfilippo, *op. cit.*, pág. 371. Es una forma de evitar "al imputado vejámenes procesales y las ansiedades que causa [la etapa adjudicativa de] un proceso criminal ... [es] una garantía más al derecho constitucional a la presunción de inocencia que goza todo imputado de delito, de acuerdo a nuestra Constitución". Íd. Véase, también, *Pueblo v. Rodríguez Aponte*, supra, pág. 665.

La presunción de inocencia es un principio consagrado del derecho penal. Un individuo imputado de delito se enfrenta a graves consecuencias sociales y personales, que incluyen una potencial pérdida de libertad física. Tam-

---

[35] Véase "Diagrama de la secuencia procesal y sinopsis de las instituciones procesales correspondientes", en Resumil de Sanfilippo, *op. cit.*, Sup.1991.

[36] Con relación al derecho a vista preliminar, "el término 'delito grave' se refiere a la clasificación legislativa independientemente de la gravedad de la pena establecida para el delito imputado o expectativa de sentencia". Resumil de Sanfilippo, *op. cit.*, pág. 370.

bién está sujeto al estigma social, al ostracismo de su comunidad, como también a otros daños de tipo social, económico y sicológico. A la luz de la gravedad de estas consecuencias, la presunción de inocencia es crucial. Asegura que hasta que el Estado pruebe la culpabilidad del acusado fuera de duda razonable, la persona es inocente. Esto es esencial en una sociedad comprometida con la justicia social. J.C. Morton y S.C. Hutchison, *The Presumption of Innocence*, Canada, Ed. Carswell, 1987, pág. 6.

Con relación a la inclusión de este derecho en nuestra Constitución, la Constituyente expresó que:

> La presunción de inocencia es una norma tan establecida en nuestros procedimientos judiciales que recomendamos su declaración constitucional más bien con el propósito de reconocer esa realidad y no de crear nuevos derechos. Es parte de nuestra constitución no escrita. 4 Diario de Sesiones de la Convención Constituyente 2569 (1951).

Su importancia ha sido reconocida en otras jurisdicciones, como por ejemplo en España donde ha sido también incluida en la Constitución. Al respecto se ha comentado que éste es "un derecho fundamental vinculante para todos los ciudadanos que tiene un claro contenido normativo procesal que todos deben respetar y cuya vigilancia corresponde a los Tribunales de Justicia". E. Romero Arias, *La Presunción de Inocencia*, Pamplona, Ed. Aranzadi, 1985, pág. 127.

La presunción de inocencia es un derecho de antiquísima estirpe. Tan temprano como en el siglo XIV, se estableció que en casos en los cuales haya duda uno opta por salvar en vez de condenar. En los tiempos modernos el miedo a convicciones injustas ha llevado a argumentar que es mejor que diez (10) personas culpables escapen a que un (1) inocente sufra. Es así como surge el principio de justicia básica que demanda que se pruebe cada uno de los elemen-

tos del delito. Es el miedo a convicciones erróneas lo que ha llevado a establecer el requisito de duda razonable.

█ Conocer simplemente el origen o fundamento para la presunción de inocencia no es suficiente. Por ello, se ha esbozado una definición más práctica. La presunción de inocencia es en verdad otra forma de expresión para una parte de la aceptada regla del peso de la prueba en los casos penales, la regla que establece que es el acusado el que tiene que producir la evidencia y persuadir más allá de duda razonable. Morton y Hutchison, *op. cit.*, págs. 4, 6, 7.

De manera que la presunción de inocencia es un derecho fundamental. Por ello se ha dicho que:

"... Sagrada es, sin duda, la causa de la sociedad, pero no lo son menos los derechos individuales ... y si el interés de los habitantes del territorio es ayudar al Estado para que ejerza libérrimamente una de sus funciones más esenciales, cual es la de castigar la infracción de la ley penal para restablecer, allí donde se turbe, la armonía del Derecho, no por esto deben sacrificarse jamás los fueros de la inocencia porque al cabo el orden social bien entendido no es más que el mantenimiento de la libertad de todos y el respeto recíproco de los derechos individuales ...". Romero Arias, *op. cit.*, pág. 24.

█ La vista preliminar, según ésta funciona en Puerto Rico, es un mecanismo procesal sencillo, comparada con la de California. Esta fue creada para beneficio del imputado e interpone al juez, el brazo judicial, entre el Ministerio Público y el imputado. Si el Estado no demuestra que tiene un mínimo de evidencia, una *scintilla*, en la cual apoyar una determinación prima facie de que se cometió un delito y con toda probabilidad el imputado lo cometió, éste no podrá ser procesado. *Esta demostración de suficiencia mínima de evidencia que se le exige al Estado antes de que pueda acusar a una persona evita vejámenes procesales injustificados, protege la reputación y dignidad de ésta, protege su derecho a un juicio justo y constituye una garantía más a su derecho constitucional a la presunción de*

*inocencia. En otras palabras, el Estado tiene que demostrar que tiene un mínimo de prueba antes de que se le permita iniciar la fase del proceso criminal que va encaminada a controvertir la presunción de inocencia, la presentación del pliego acusatorio.*

La vista preliminar con carácter privado persigue la finalidad de evitar que un ciudadano sea injustificadamente sometido a los rigores de la fase adjudicativa de un proceso criminal, lo cual sería sumamente oneroso tanto para el ciudadano imputado como para el estado igualmente. Véanse: *Pueblo v. López Camacho*, supra; *Pueblo v. Rivera Alicea*, supra. Todo esto sin convertirla en un "mini juicio".

Además protege el derecho de todo acusado a que se le celebre un juicio justo e imparcial. Este derecho también surge por imperativo de las disposiciones constitucionales sobre el derecho de todo acusado a un debido procedimiento de ley y a tener un juzgador imparcial. Véanse: Art. II, Secs. 7 y 11, Const. E.L.A., L.P.R.A., Tomo 1; *Pueblo v. Robles González*, 125 D.P.R. 750 (1990); *Pueblo v. Martín Aymat*, 105 D.P.R. 528, 534, (1977). La garantía esencial del debido proceso de ley es aquella del trato justo (*fairness*). 2 *Rotunda, Nowak y Young, Treatise on Constitutional Law: Substance and Procedure* Sec. 17.8 (1986), pág. 250.

Hemos utilizado frecuentemente la frase "juicio justo e imparcial" desde temprano en este siglo. *Ex-parte Acevedo et al.*, 1 D.P.R. 275, 287 (1902). Aunque no aparece literalmente en nuestra Constitución, esta frase resume la noción fundamental de que todos los procesos judiciales se conduzcan con justicia, esto es, darle a cada quien lo que le corresponde, y con imparcialidad, es decir, con ausencia de favoritismo o prejuicio hacia las partes involucradas. En el contexto del proceso criminal, la frase "juicio justo e imparcial" entraña todos aquellos derechos y garantías estable-

cidas por la Constitución que amparan a la ciudadanía frente a posibles arbitrariedades del Estado, tales como el derecho a un juicio rápido y público, el derecho a carearse con los testigos de cargo y a gozar de la presunción de inocencia. Véase Art. II, Sec. 11, Const. E.L.A., *supra*. Esta frase ha sido incorporada a la Regla 81 de Procedimiento Criminal, 34 L.P.R.A. Ap. II.

Con relación al juicio en un caso criminal, hemos señalado que "la publicación de noticias sobre el proceso judicial no constituye de por sí una violación al derecho del acusado a un juicio justo e imparcial", derecho éste de igual jerarquía constitucional que el derecho a la libertad de prensa. Véanse: *Pueblo v. Pérez Santaliz*, 105 D.P.R. 10, 14 (1976); *Pueblo v. Maldonado Dipiní*, 96 D.P.R. 897 (1969).([37])

Ahora bien, por la forma y manera en que la vista preliminar se conduce en Puerto Rico y por el hecho de que ésta se lleva a cabo en la etapa investigativa judicial, el hacerla abierta al público podría tener graves repercusiones para el derecho del imputado a un juicio justo. La publicidad perjudicial se originaría en la etapa investigativa judicial donde el imputado se confronta con un proceso en que el *quantum* de la prueba para demostrar la existencia de causa probable es una *scintilla*. Sólo se requiere que haya prueba suficiente para determinar que existe un caso prima facie; la evidencia inculpatoria puede ser de naturaleza totalmente inadmisible en el juicio, y al acusado se le puede limitar su oportunidad de presentar prueba. *Pueblo v. Rodríguez Aponte*, supra; *Gannett*, pág. 378.

---

([37]) Para demostrar que la publicidad ha sido perjudicial al derecho del acusado, éste tiene que probar "afirmativa y satisfactoriamente" que la misma fue "de tal naturaleza, impacto y exposición" que le privó de su derecho a un juicio justo e imparcial. *Pueblo v. Lebrón González*, 105 D.P.R. 10, 15, (1976). La posibilidad de perjuicio puede surgir "cuando la publicidad es parcializada, inflamatoria, derogatoria o tan intensa que pueda razonablemente inferirse una atmósfera de pasión contra el acusado". *Pueblo v. Pérez Santaliz*, 113 D.P.R. 81, 86 (1982).

El despliegue en los medios de este tipo de información dificulta que se pueda celebrar un juicio justo e imparcial. No se trata solamente del contacto que pueda tener el Jurado con una publicidad perjudicial durante el desarrollo del juicio. La publicidad adversa durante esta etapa investigativa reduce grandemente el número de candidatos idóneos para desempeñarse como juzgadores de hechos, personas que actúen con total imparcialidad y rectitud. Además dificulta las medidas correctivas que se puedan tomar para evitar los efectos perjudiciales de la publicidad.(38) Regla 121(e) de Procedimiento Criminal, 34 L.P.R.A. Ap. II. No estamos ante una especulación, sino ante una realidad, sobre todo en nuestra jurisdicción "donde el territorio es reducido y la población compacta, servida por medios de comunicación y difusión de eficacia máxima [por lo que], sería imposible formar un jurado totalmente ignorante y desconocedor ...". *Pueblo v. Tursi*, 105 D.P.R. 717, 720 (1977). "La publicidad excesiva sobre un caso que sea perjudicial al acusado hace más difícil la selección de un Jurado imparcial y la celebración de un juicio justo." *Pueblo v. Hernández Mercado*, 126 D.P.R. 427, 436 (1990).

Si se abriera la celebración de la vista preliminar, según ésta se conduce actualmente en Puerto Rico, al público y a la prensa, los candidatos a jurado estarían más propensos a ser afectados en su objetividad. Estarían en contacto no sólo con información general sobre el caso y el imputado, *sino que también podrían tener acceso a información inculpatoria inadmisible en juicio, además de conocer de antemano parte de la prueba que tienen el Fiscal y el acusado.*

Cabe señalar, además, que debido a que las Reglas de Procedimiento Criminal requieren que la vista preliminar

---

(38) A nivel del juicio existen medidas correctivas para minimizar el impacto adverso de la publicidad perjudicial al derecho del acusado. Entre ellas están el secuestro del Jurado, impartir instrucciones remediativas, suspender los procedimientos u ordenar el traslado a otra sala. *Pueblo v. Hernández Mercado*, 126 D.P.R. 427 (1990).

se señale en un lapso de tiempo relativamente corto después del arresto, esto frecuentemente imposibilitaría que el imputado pudiera demostrar el prejuicio existente en su caso o la necesidad de que para poder obtener un juicio justo la vista preliminar sea cerrada. El abrir al público el proceso criminal investigativo en la etapa de vista preliminar también podría traer el indeseable resultado de que al imputado, en ocasiones, se le pusiera en la posición de tener que defender su reputación frente a evidencia que ni siquiera llega a establecer un caso prima facie en su contra.

La vista preliminar en Puerto Rico es un mecanismo procesal creado para beneficio del imputado y así evitar someterlo a un juicio criminal en su fondo de no alcanzarse el *quantum* de prueba requerido para encontrar causa probable para acusar. De esta manera se protege no sólo la presunción de inocencia, sino también la intimidad y dignidad del imputado. Toda medida que proteja y refuerce el derecho del imputado a la presunción de inocencia y a que no se le exponga injustificadamente a la pérdida de su intimidad y dignidad, en el balance de intereses, debe inclinarse a su favor.

En lo que se refiere al imputado, sobre todo al que resulta finalmente exonerado en vista preliminar, ésta resulta en extremo onerosa. Entre otras cosas por el menoscabo que sufre su presunción de inocencia y por el estigma que conlleva que se le haya imputado la comisión de un delito sin que siquiera se haya aportado una *scintilla* de prueba para demostrar, prima facie, que se cometió el delito y que éste fue quien probablemente lo cometió. Tal estigma es, de por sí, suficiente para hacerle sentir denigrado como persona en su fuero interno y ante la sociedad. Se le hiere en su dignidad como ser humano y se le expone al rechazo público.

Ninguna persona se desprende de sus derechos

humanos, civiles y constitucionales por el simple hecho de que se le impute haber delinquido. El imputado sigue siendo acreedor, entre los muchos derechos que le asisten, al de la intimidad y a que se le respete su dignidad. Art. II, Secs. 1 y 8 de la Carta de Derechos, Const. E.L.A., *supra*.[39]

■ Contrario a lo que sucede en Estados Unidos, donde el derecho a la intimidad tiene un origen incierto, en nuestra Constitución éste ha quedado consagrado con toda claridad. *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250, 260 (1978). Este derecho que adquirió rango constitucional en nuestra jurisdicción mucho antes que en la jurisdicción norteamericana, surge expresamente del Art. II, Sec. 8 de la Constitución del Estado Libre Asociado, *supra*, el cual

---

[39] En lo pertinente, estas disposiciones señalan lo siguiente:

"Sección 1: La dignidad del ser humano es inviolable. Art. II, Sec. 1 de la Carta de Derechos, Const. E.L.A., Tomo 1, ed. 1982, pág. 257.

"Sección 8: Toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar." Art. II, Sec. 8 de la Carta de Derechos, Const. E.L.A., Tomo 1, ed. 1982, pág. 292.

Ambos derechos están relacionados entre sí. Así se desprende de lo señalado durante la presentación del Informe de la Comisión de la Carta de Derechos de nuestra Asamblea Constituyente, que precedió a la inclusión de dicha Carta como parte integral de la Ley Fundamental, cuando, con relación al Art. II, Sec. 1 de la Constitución del Estado Libre Asociado, *supra*, se dijo lo siguiente:

"El propósito de esta sección es fijar claramente como base constitucional de todo lo que sigue el principio de la dignidad del ser humano y, como consecuencia de ésta, la igualdad esencial de todas las personas dentro de nuestro sistema constitucional." 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico, 2561 (1951). (En adelante Diario de Sesiones)

Con referencia al Art. II, Sec. 8 de nuestra Constitución, *supra*, y a su relación con el Art. II, Sec. 1 del mencionado documento, se expresó que:

"La protección contra ataques a la honra, reputación y vida privada constituye también un principio que complementa el concepto de la dignidad humana mantenido en esta constitución. Se trata de la inviolabilidad personal en su forma más completa y amplia. El honor y la intimidad son valores del individuo que merecen protección cabal, no sólo frente a atentados provenientes de otros particulares, sino también contra injerencias abusivas de las autoridades." 4 Diario de Sesiones, pág. 2566.

Según podemos apreciar de lo que antecede, el derecho a la intimidad, contenido en el Art. II, Sec. 8 de la Constitución del Estado Libre Asociado, *supra*, está subsumido y es complemento del concepto más abarcador de "dignidad humana".

proviene, a su vez, del Art. V de la Declaración Americana de los Derechos y Deberes del Hombre y del Art. 12 de la Declaración Universal de los Derechos del Hombre. Véanse, además: *E.L.A. v. Hermandad de Empleados*, 104 D.P.R. 436, 439 (1975); *Cortés Portalatín v. Hau Colón*, 103 D.P.R. 734, 738 (1975).

El derecho a la intimidad ha sido objeto de amplia discusión en nuestra jurisprudencia. En torno a la razón para incluirlo en nuestra Constitución señalamos en *E.L.A. v. Hermandad de Empleados*, supra, págs. 439–440, lo siguiente:

> El reconocimiento del derecho a la intimidad en la Constitución de Puerto Rico obedeció básicamente a dos factores. Se estaba respondiendo, en primer término, a un concepto del individuo hondamente arraigado en nuestra cultura ....
> En segundo término, se quería formular una Carta de Derechos de factura más ancha que la tradicional, que recogiese el sentir común de culturas diversas sobre nuevas categorías de derechos.

Sobre este particular, la Comisión de Derechos Civiles de Puerto Rico expresó que para decidir la controversia del caso de autos hay que "considerar que en la esfera de nuestro derecho puertorriqueño, el derecho a la intimidad tiene una más amplia protección constitucional". *Boletín de Derechos Civiles*, 1992, Núm. 1, pág. 4.

Es este fundamento dual el que provee una fuerza distinta a nuestro derecho a la intimidad y que nos permite extenderlo y aplicarlo, con validez incuestionable, a situaciones impensadas bajo las disposiciones constitucionales norteamericanas.

Su firme arraigo en la cultura de nuestro pueblo es la más nítida expresión de que "el derecho a la intimidad goza de un altísimo sitial en nuestra escala de valores ...". *E.L.A v. Hermandad de Empleados*, supra, pág. 445. Esto, unido a su reconocimiento a nivel internacional como

uno de los derechos más fundamentales del ser humano, ha logrado que el derecho a la intimidad tenga un nivel de primacía en nuestra Carta de Derechos. *P.R. Tel. Co. v. Martínez*, 114 D.P.R. 328 (1983). Por su naturaleza e importancia, la disposición constitucional que reconoce el derecho a la intimidad no necesita legislación para implantarla, opera *ex proprio vigore* y se puede hacer valer no sólo frente al Estado, sino también entre personas privadas. Véanse: *Colón v. Romero Barceló*, 112 D.P.R. 573 (1982); *Alberio Quiñones v. E.L.A.*, 90 D.P.R. 812 (1964); *González v. Ramírez Cuerda*, 88 D.P.R. 125 (1963).[40]

Así, nosotros, como intérpretes últimos de la Constitución, hemos reconocido el derecho a la intimidad como uno de los más preciados "en la vida de todo ser humano en una sociedad democrática", un derecho constitucional que goza "de la más alta jerarquía y [constituye] una crucial dimensión en los derechos humanos". *Arroyo v. Rattan Specialties, Inc.*, 117 D.P.R. 35, 56 y 62 (1986).

Con relación al sitial que ocupa el derecho a la intimidad en nuestro esquema constitucional, para comprender el carácter privilegiado del mismo basta con examinar lo expresado en *P.R. Tel. Co. v. Martínez*, supra, pág. 339, cuando dijimos:

> Tan trascendental es este derecho en nuestra sociedad que, en las ocasiones en que se ha contrapuesto a otros de similar jerarquía, ha salido airoso del careo constitucional. Así, por ejemplo, ha prevalecido ante los derechos fundamentales siguientes: de libre expresión, *Hermandad de Empleados*, supra (piquete frente a la residencia del Secretario del Trabajo); de libertad de culto, *Sucn. de Victoria* [v. *Iglesia Pentecostal*, 102 D.P.R. 20 (1974) ], supra (servicios religiosos que trascendían al vecindario); y de propiedad, *Torres v. Rodríguez*, 101 D.P.R. 177 (1973) (establecimiento de funeraria en zona residencial), [*Arroyo v. Rattan Specialties, Inc., supra* (utilización del polí-

---

[40] El Tribunal Supremo federal en *Press-Enterprise II*, págs. 511–512, reconoció el deber de proteger, dentro del contexto de un juicio criminal, los derechos de intimidad de los jurados.

grafo para corroborar la información suministrada por un empleado a su patrono y asegurarse que es cierta y correcta para así evitar que su propiedad sufra daño, menoscabo o sea objeto de apropiación ilegal)]. También ha predominado frente a la legislación limitante de la decisión de los cónyuges que por mutuo acuerdo optan por terminar su matrimonio. *Figueroa Ferrer*, supra.

De conformidad con todo lo antes expresado hemos resuelto que "[e]n ausencia de circunstancias especiales que configuren intereses apremiantes del Estado, nuestra sociedad requiere que inclinemos la balanza en favor de la protección [del derecho] a la intimidad ...". *Arroyo v. Rattan Specialties, Inc.*, supra, pág. 63.

De otra parte, también hemos reconocido que "[l]os ciudadanos de una sociedad que se gobierna a sí misma deben poseer el derecho legal de examinar e investigar cómo se conducen sus asuntos, sujetos sólo a aquellas limitaciones que impone la más urgente necesidad pública". *Dávila v. Superintendente de Elecciones*, 82 D.P.R. 264, 281 esc. 9 (1960). Con relación a documentos en poder de la Rama Ejecutiva, en *Soto v. Srio. de Justicia*, 112 D.P.R. 477, 495 (1982), resolvimos que a manera de excepción la Asamblea Legislativa podía aprobar legislación para sustraer del escrutinio público, pero "[d]icha legislación, [al igual que] cualquier otra que incida sobre derechos fundamentales, tiene que justificarse a plenitud y contener normas claras y precisas que permitan identificar adecuadamente el material y las circunstancias en que habrá de aplicarse la norma de accesibilidad". En *Santiago v. Bobb y El Mundo, Inc.*, 117 D.P.R. 153, 159 (1986), expresamos que "la secretividad en los asuntos públicos es excepción y no norma".

Estamos, pues, frente a dos (2) derechos constitucionales fundamentales, el derecho a la libre expresión y el derecho a la intimidad. Nuestro legislador, reconociendo la necesidad de proteger a todo ciudadano que se confronta con un proceso penal por delito grave de posibles abusos,

quiso interponer entre la etapa investigativa judicial y la adjudicativa, un mecanismo, sencillo pero eficaz, para evitar que a una persona se le pudiese someter al rigor de un juicio criminal con todas las inevitables consecuencias detrimentales a su derecho a la presunción de inocencia, a su dignidad e intimidad y a su derecho a un juicio justo e imparcial sin que el Estado siquiera tuviese un *quantum* de evidencia mínima para apoyar una determinación prima facie de causa probable. Si no se determina causa probable no se le permite al Estado presentar el pliego acusatorio cuestionando la presunción de inocencia del imputado. La intención legislativa fue la de, en esta etapa preliminar investigativa del proceso penal, proteger al ciudadano que tiene derecho a la presunción de inocencia de los rigores de una acusación injustificada, desprovista de fundamento evidenciario. Para lograr este propósito legislativo, la Regla 23(c), *supra*, dispone que la vista preliminar será privada, salvo que el imputado al comienzo solicite que sea abierta. Claro está, en aquellos casos en que el propio imputado por sus actuaciones y conducta haya renunciado implícitamente a esta protección o cuando las circunstancias particulares del caso hagan innecesaria que la misma, para cumplir el propósito legislativo, sea privada, la vista preliminar podrá abrirse al público aún sin el consentimiento del imputado.

Después de todo, el propósito de la interpretación [de una ley] es lograr que se cumplan los fines intentados por el legislador. "Las leyes deben interpretarse y aplicarse en comunión con el propósito social que las inspira. No deben desvincularse del problema humano cuya solución persiguen, ni descarnarse de las realidades de la vida que la sociedad misma ha proyectado sobre ellas, pues se tornaría ilusorio y se perdería en el vacío el deseo de justicia que las genera". *Figueroa v. Díaz*, 75 D.P.R. 163, 171 (1953). Véanse, además: *García Pagán v. Shiley Cari-*

*bbean, etc.*, 122 D.P.R. 193 (1988); *Pueblo v. Pizarro Solís*, 129 D.P.R. 911 (1992); *Zambrana Maldonado v. E.L.A.*, 129 D.P.R. 740 (1992); *Calderón v. Adm. Sistemas de Retiro*, 129 D.P.R. 1020 (1992). "[A]l cumplir con nuestra función [de interpretar las leyes] los jueces no podemos considerar las leyes aisladamente, como pronunciamientos de principios en abstracto o como medidas formuladas para satisfacer los problemas efímeros del momento. *Tenemos el deber de hacer que el derecho sirva de propósitos útiles y evitar una interpretación tan literal que lleve a resultados absurdos.*" (Énfasis suplido.) *Pacheco Rodríguez v. Vargas*, 120 D.P.R. 404, 409 (1988). Véanse, además: *Passalacqua v. Mun. de San Juan*, 116 D.P.R. 618, 632 (1985); *Ortiz Morales v. A.C.A.A.*, 116 D.P.R. 387, 391 (1985); *P.R. Tel. Co. v. Martínez*, supra.

Debe tenerse en cuenta que la vista preliminar establece un procedimiento encausado al limitado propósito de que un magistrado determine si el Ministerio Público posee, por lo menos, un mínimo de evidencia que justifique que el proceso continúe y se presente una acusación. Una vez el magistrado se convence que existe ese mínimo de evidencia puede, sin oír testimonio o prueba de defensa, determinar causa probable. La privacidad de la vista es el medio más efectivo que posee el Estado para proteger el derecho a la presunción de inocencia, a un juicio justo e imparcial y a la intimidad de una persona en esta etapa investigativa judicial del proceso criminal. Mantener privada la vista preliminar promueve un juicio justo e imparcial y provee una garantía adicional al derecho constitucional a la presunción de inocencia.

Aunque reconocemos los beneficios que el abrir todo proceso penal al escrutinio público podría conllevar, somos de la opinión que aunque estamos frente a un interés fundamental legítimo, en el balance de intereses, el daño que esto podría acarrear al derecho de todo acusado a un juicio justo e imparcial, a la presunción de inocencia y a la pro-

tección a su reputación y dignidad como ser humano, justifican que la vista preliminar, *según ésta se celebra actualmente en Puerto Rico*, sea, como norma general, una privada, salvo que el imputado al comenzar la misma solicite que ésta sea abierta, o que por sus actuaciones o conducta se pueda entender que implícitamente la ha renunciado, o que por las circunstancias particulares del caso no esté presente el derecho que se intenta proteger.

## IX

### Conclusión

Resumiendo, no cabe la menor duda que en el juicio en sí y en todos los procedimientos de la etapa adjudicativa existe un derecho constitucional del público y la prensa de acceso limitado al amparo de la Primera y Decimocuarta Enmiendas y un derecho del acusado a juicio público bajo la Sexta y Decimocuarta Enmiendas. Véanse: *Richmond; Globe; Press-Enterprise I; Press-Enterprise II; Waller; Gannett.* Sin embargo, cuando se está ante un procedimiento en la etapa investigativa judicial del proceso penal, el Tribunal Supremo federal aún no ha determinado que exista ese derecho constitucional de la prensa y el público de acceso limitado al amparo de la Primera Enmienda. No hemos encontrado caso alguno a nivel del Tribunal Supremo de Estados Unidos en el cual se haya considerado este planteamiento constitucional.

La experiencia y la lógica no avalan la conclusión de que al público y a la prensa le asista un derecho constitucional de acceso limitado a la vista preliminar, según ésta se celebra y funciona en Puerto Rico.([41]) En nuestra jurisdicción

---

([41]) Cabe señalar que, a pesar de que la controversia de si la vista preliminar tiene o no que ser abierta, ha generado gran publicidad y polémica, nuestra legislatura no la ha repudiado. Ahora bien, si en el futuro se decidiera como política pública, enmendar la Regla 23 (c) de Procedimiento Criminal, 34 L.P.R.A. Ap. II, habría

la vista preliminar se celebra en contra de un imputado y antes de la lectura de la acusación, muy distinto de lo que ocurre en California, donde la vista preliminar se celebra en contra de un acusado, es decir, después de la lectura de la acusación.

Haciendo un balance de intereses entre los derechos a un juicio justo, a la protección de toda persona a su dignidad y "contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar" (Art. II, Sec. 8, Const. E.L.A., *supra*) y a que le asista una presunción de inocencia, de un lado, y el derecho del público y la prensa a estar informados, entendemos, que en las circunstancias específicas que atiende la Regla 23 (c) de Procedimiento Criminal, *supra*, pesan más y deben prevalecer los primeros. La prensa y el público, cuando se sobrepase la barrera de un mínimo de prueba que se requiere para determinar causa probable en vista preliminar, tendrá derecho a acceso limitado al proceso adjudicativo criminal, conforme a las normas jurisprudenciales al amparo de nuestra *Constitución y de* la Constitución federal.

Por todo lo cual, *se confirma la sentencia apelada, dictada por el Tribunal Superior, Sala de San Juan, el 29 de enero de 1990. Se dictará sentencia de conformidad con lo expresado en esta opinión.*

El Juez Asociado Señor Negrón García emitió opinión disidente. El Juez Asociado Señor Hernández Denton emitió opinión disidente, a la cual se unió el Juez Asociado Señor Negrón García. El Juez Asociado Señor Rebollo López disintió sin opinión escrita.

---

que revisar la forma y manera en que ésta se conduce actualmente para evitar afectar derechos constitucionales fundamentales del imputado a la protección de su dignidad y "contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar". Art. II, Sec. 8, Const. E.L.A., *supra*.

— O —

Opinión disidente del Juez Asociado Señor Negrón García.

I

La administración de justicia no es asunto exclusivo de jueces, abogados y fiscales, sino de interés general ciudadano. Mediante el adecuado y eficaz funcionamiento de los tribunales se procura dirimir las controversias y lograr la paz social.

En lo penal, constitucionalmente hablando, el concepto juicio "público" —Art. II, Sec. 11 de la Carta de Derechos, Const. E.L.A., L.P.R.A., Tomo 1— se opone a lo "secreto". Se trata de una característica que opera en dos (2) dimensiones: para beneficio del imputado y de la sociedad en general. Mediante éste se garantiza que el público vea que el imputado es encausado justamente, que el juez o el jurado esté consciente de su alta responsabilidad y, por ende, de la importancia de descargar sus funciones sensible e imparcialmente, libre de caprichos y favoritismos.

Una de las grandes insatisfacciones actuales con el sistema de justicia puertorriqueño es el manto de misterio tejido en torno a la vista preliminar en los casos penales. Regla 23 (c) de Procedimiento Criminal, 34 L.P.R.A. Ap. II. Por mejores que sean las cualidades de la Judicatura, se trata de una situación en que lo oculto genera suspicacia, promueve malos entendidos y frustra la expectativa ciudadana de que los procesos judiciales sean abiertos.

II

Bajo el Art. II, Sec. 4 de nuestra Carta de Derechos, L.P.R.A., Tomo 1, la "prensa", esto es, todos los distintos medios masivos de comunicación social —diarios, radio, te-

levisión y revistas— tienen constitucionalmente un interés legítimo y particular en lograr su acceso y preservar su apertura. "En la esfera política, los medios informativos han sido llamados con propiedad 'la cuarta rama del gobierno', nombre que describe la función del periodismo como guardián fiel y motivador de las otras tres ramas. El medio tiene poder e influencia en las esferas sociales, políticas y económicas de la sociedad." L. Brown, *Responsabilidad Social de la Prensa*, Méjico, Eds. Asociados, 1977, pág. 9.

Aun con todas las imperfecciones de esos medios de comunicación, en una democracia la publicidad tiende a garantizar posteriormente un control constructivo sobre la obra gubernamental, incluso la administración de justicia; sobre todo, fomenta su credibilidad. *Soto v. Srio. de Justicia*, 112 D.P.R. 477 (1982).

La característica medular del periodismo moderno es su dinamismo: noticia del momento, actualizada y procesada instantáneamente por medio de la televisión, la radio y, en cierta medida, la prensa diaria escrita.

### III

No existe evidencia alguna en qué apoyar la tesis de que abrir la vista preliminar sea per se nocivo o incida negativamente sobre el derecho de intimidad de un imputado; si así fuera, ¿cómo explicar que la aludida Regla 23 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, visualice que sea pública a solicitud del imputado?

Desengañémonos; la vista preliminar no es una vaca sagrada. Su concepción de "privada" simplemente fue el resultado de una visión con raíces históricas seguida por este Tribunal al adoptar originalmente la Regla 23 de Procedimiento Criminal, *supra*, al calor de la Primera Conferencia Judicial en 1958, subsiguientemente refrendada por la Asamblea Legislativa al ponerla en vigor en 1963.

Distante en el tiempo, al cabo de casi tres (3) décadas la libertad de prensa de ayer no puede tener el mismo contenido. La prensa de hoy, con su progreso técnico y veloz intercomunicación internacional, no es ni la sombra de la de entonces. La aparición de otros medios de comunicación social ha revolucionado totalmente las expectativas y ha revolucionado responsabilidades del derecho de acceso y a la información. ¿Es que ahora vamos a enquistarlo y encerrarlo para siempre en una tapia constitucional?

## IV

Los dos (2) argumentos principales que se aducen contra la apertura de la vista preliminar es que si el imputado es exonerado puede violarse su derecho a la intimidad y, además, de determinarse causa probable, generar una publicidad excesiva que influencie negativamente al Jurado y afecte sus derechos.

La debilidad de ambos argumentos es manifiesta. Sea privada o abierta, la celebración de una vista preliminar significa que ha mediado *antes* una denuncia y una orden de arresto. Regla 6(a) de Procedimiento Criminal, 34 L.P.R.A. Ap. II. Se trata, pues, de una situación en que el Estado ya ha intervenido con la persona imputándole en un tribunal un delito y, para sujetarla a su jurisdicción, ha restringido su libertad mediante una citación, fianza o, en su defecto, ha ordenando su prisión en sumaria. La denuncia presupone un expediente judicial público con el nombre del imputado, su dirección y demás circunstancias personales y, además, una narración sucinta de los hechos constitutivos del delito. Esa denuncia, como documento público, siempre ha estado accesible.

No vemos entonces cómo puede sostenerse que la apertura de la vista preliminar sea factor determinante que afecte la intimidad del imputado. Ciertamente es cuestión de grados, a saber, una mayor exposición pública. Frente a

estas circunstancias, la dosis de riesgo de esa exposición pública existe previamente y subsistirá. La experiencia demuestra que cualesquiera casos, sobre todo los notorios, se destacan y comentan en la prensa y, normalmente, son objetos de ávido seguimiento ciudadano. Por ende, en nuestro sistema de administración de justicia, la garantía de que los miembros del Jurado actúen imparcial y ecuánimemente, no depende del proceso sigiloso ni de la ignorancia, sino del compromiso íntimo con sus conciencias y, claro está, de las instrucciones y demás medidas cautelares que los tribunales, tradicionalmente adoptan. Véanse: *Pueblo v. Miranda Santiago*, 130 D.P.R. 507 (1992); *Pueblo v. Lebrón González*, 113 D.P.R. 81, 86 (1982); *Pueblo v. Tursi*, 105 D.P.R. 717, 720 (1977).

Ante esta realidad, qué es más beneficioso para el acusado, ¿el relato veraz, producto de la observación directa, o la reseña inexacta, el comentario a la ligera o el imperfectamente narrado, resultado de la especulación por ser un proceso secreto? Ciertamente, si el proceso se mantiene a escondidas, nunca los medios noticiosos podrán dar ni podremos exigirles la más amplia cobertura y que lo que publiquen sea información fidedigna y correcta.

## V

Finalmente, aun cuando la vista preliminar no es un juicio plenario, existe un fundamento contundente a nivel constitucional que exige su apertura: promover la "fe en la justicia". Sabido es que con posterioridad a la determinación en los méritos de causa probable para un arresto por delito grave, en múltiples ocasiones la vista preliminar —original o en alzada— es el *único y último* foro en que se dilucida una causa criminal. *Pueblo v. Cruz Justiniano*, 116 D.P.R. 28, 30 (1984). Ausente un interés gubernamental apremiante, nuestra Constitución no tolera un sistema

judicial que niegue acceso a uno de los dramas adjudicativos más importantes y trascendentales.

La prensa activa "no sólo informa la noticia, critica y denuncia, sino que la investiga, participa y la hace". *Oliveras v. Paniagua Diez*, 115 D.P.R. 257, 265 (1984). Su función social no puede realizarse bajo la tutela oficial, aunque sea judicial y bien intencionada.

Sólo si los tribunales juzgan abiertamente, de cara al público, fomentamos que todo dictamen judicial que archive y ponga fin a una denuncia por delito grave —al no existir causa probable— goce de mayor credibilidad, sea justo y correcto: *lisa y llanamente la luz solar sigue siendo el mejor desinfectante.*

— O —

Opinión disidente emitida por el Juez Asociado Señor Hernández Denton, a la cual se une el Juez Asociado Señor Negrón García.

Nuevamente nos enfrentamos al reclamo de la prensa a tener acceso a los procedimientos criminales anteriores al juicio.[1] Hasta esta decisión, siempre habíamos favorecido

---

[1] Tomamos conocimiento judicial de que en *Pueblo v. Jarabo*, Caso Núm. CE-92-52, denegamos la petición de *certiorari* del imputado que cuestionaba la decisión del Tribunal Superior en la que permitía el acceso de la prensa a la vista de determinación de causa para arresto bajo la Regla 6 de Procedimiento Criminal, 34 L.P.R.A. Ap. II. Mediante Resolución de 3 de febrero de 1992 emitimos la resolución siguiente:

"Consideradas las circunstancias particulares de la extensa exposición y divulgación pública a que voluntariamente se sometió el peticionario, y a la luz de los derechos envueltos, no ha lugar a su solicitud.

"Notifíquese por correo y por la vía telefónica.

"Lo acordó el Tribunal y certifica el señor Secretario General. El Juez Asociado señor Rebollo López simplemente proveería un no ha lugar al recurso solicitado. El Juez Asociado señor Hernández Denton en vista de la importancia de los intereses constitucionales en conflicto, libertad de prensa y el derecho de intimidad, paralizaría los procedimientos en el foro de instancia y expediría a los fines de pautar la norma apropiada que deba seguirse en el futuro. Por las consideraciones anteriormente expuestas, acortaría los términos reglamentarios y le daría atención priorita-

la apertura de los procedimientos judiciales al público y la prensa para promover la pureza del sistema y fortalecer la confianza de la ciudadanía en esta Rama. La opinión mayoritaria cambia esta trayectoria decisoria y convalida una regla procesal que viola el Art. II, Sec. 4 de la Carta de Derechos de la Constitución del Libre Asociado, L.P.R.A., Tomo 1, y la Primera y Decimocuarta Enmiendas de la Constitución de Estados Unidos. Como la vista preliminar regulada por la Regla 23 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, en muchos casos, es la única ocasión en que la ciudadanía puede observar lo que ocurre en el proceso criminal, abriríamos las puertas de los tribunales para permitirles al público y a la prensa estar presentes. Disentimos.

La controversia del caso de autos requiere que sopesemos los derechos constitucionales que tiene todo acusado a un juicio justo e imparcial frente al derecho que tiene la prensa y el público a presenciar los procedimientos criminales. Hoy ratificamos nuestros pronunciamientos en *Pueblo v. Hernández Mercado*, 126 D.P.R. 427, 435–436 (1990), sobre la función de la prensa en nuestro país:

> Nuestra doctrina parte de la premisa que la publicación de noticias sobre los procedimientos criminales mantiene al público informado sobre asuntos de su interés y que existe un derecho fundamental de la prensa a publicar lo ocurrido en el sistema de justicia criminal. ... En momentos en que la criminalidad afecta la paz y tranquilidad de todos los puertorriqueños, la prensa cumple una función eminentemente social al divulgar información sobre los casos judiciales.

---

ria a la Resolución de la controversia de auto."

Por otro lado, en *El Vocero de Puerto Rico v. Hon. Carlos Cabán García*, Caso Núm. MD–92–1, denegamos un recurso de mandamiento en jurisdicción original presentado por el periódico El Vocero y ordenamos el traslado del asunto al Tribunal Superior, Sala de San Juan. El 3 de febrero de 1992, el Tribunal Superior (Hon. Ángel Hermida, Juez) ordenó al tribunal, en el cual se ventilaban unos cargos contra el Sr. José Ronaldo Jarabo, que concediera audiencia al periódico antes de resolver si la vista debía ser pública o privada.

# I

La petición de acceso a las vistas preliminares, presentada por El Vocero de Puerto Rico (en adelante El Vocero), está apoyada en el derecho constitucional de libertad de prensa y de expresión garantizado tanto por nuestra Constitución como por la de Estados Unidos. Aunque las garantías de la Primera Enmienda en la Constitución de Estados Unidos establecen un contenido mínimo de derechos en Puerto Rico, *Aponte Martínez v. Lugo*, 100 D.P.R. 282, 287 (1971), nuestro Tribunal ha impartido una dimensión amplia y robusta a la libertad de expresión consagrada en el Art. II, Sec. 4 de la Constitución del Estado Libre Asociado, *supra.* Con una visión más abarcadora y protectora del derecho a la libre expresión y de prensa, hemos reconocido que un ciudadano posee un derecho constitucional a examinar la información que tiene el Estado, sujeto sólo a aquellas limitaciones que exigen los intereses más apremiantes del Gobierno. *Soto v. Srio. de Justicia*, 112 D.P.R. 477, 485 (1982).

La clara tendencia a favor de la divulgación de información pública fue inicialmente expresada en *Sierra v. Tribunal Superior*, 81 D.P.R. 554 (1959), seguida en *Dávila v. Superintendente de Elecciones*, 82 D.P.R. 264 (1960), culminada en *Soto v. Srio. de Justicia*, supra, y ratificada en *Santiago v. Bobb y El Mundo, Inc.*, 117 D.P.R. 153, 159 (1986), y en *López Vives v. Policía de P.R.*, 118 D.P.R. 219 (1987).

En *Soto v. Srio. de Justicia*, supra, pág. 495, establecimos que "toda legislación que pretenda ocultar información a un ciudadano bajo el palio de la confidencialidad debe ser interpretada restrictivamente a favor del derecho del pueblo a mantenerse informado. Dicha legislación, como cualquier otra que incida sobre derechos fundamentales, tiene que justificarse a plenitud y contener normas claras y precisas que permitan identificar ... las circuns-

tancias en que habrá de aplicarse la norma de accesibilidad".

En *López Vives v. Policía de P.R.*, supra, pág. 228 esc. 7, afirmamos que los casos de *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) (en adelante *Richmond*), y *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982) (en adelante *Globe*), "no gozan de la amplitud y vigor de nuestro pronunciamiento en *Soto v. Srio. de Justicia* ...". En otras palabras, bajo el palio de nuestra Constitución, tanto los ciudadanos como la prensa tienen un derecho constitucional a obtener información en manos del Estado: "Nuestra doctrina jurisprudencial ha fortalecido este esquema constitucional. Hoy día la secretividad en los asuntos públicos es excepción y no norma". *Santiago v. Bobb y El Mundo, Inc.*, supra, pág. 159.

En el caso particular de los procedimientos judiciales, históricamente éstos han sido foros abiertos al público donde regularmente se ventilan asuntos de gran importancia para el país. Como en Estados Unidos, por imperativo constitucional en Puerto Rico, los juicios han sido abiertos al público. Así se garantiza no solamente que los ciudadanos estén adecuadamente informados de lo que ocurre en los tribunales, sino también se asegura que se observen los derechos procesales y que se imparta justicia a todos por igual:

> El tribunal de justicia es un "teatro de justicia" donde se escenifica un drama social de vital importancia; si se cierran sus puertas, el público solamente podrá preguntarse si el ritual solemne de la condena comunitaria se ha llevado a cabo de forma adecuada. (Traducción nuestra y escolio omitido.) L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988 pág. 958.

Además, recordemos que en nuestro ordenamiento constitucional el Estado tiene no solamente el deber de proteger los derechos humanos, sino también propiciar y tomar acciones afirmativas para promover el desarrollo pleno de

esos derechos. J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. U.P.R., Vol. III, pág. 200. La apertura de los tribunales garantiza que el público pueda observar de cerca "un tipo de drama público, un foro público para ver y escuchar, en vez de un foro para expresarse". (Traducción nuestra y énfasis en el original suprimido.) Tribe, *op. cit.*, pág. 965.

Ello no significa que este derecho de acceso a los procedimientos judiciales sea absoluto. Al igual que otros derechos constitucionales, este derecho puede ser limitado por el Estado si existe un interés apremiante que lo justifique. Sin embargo, como cada caso tendrá unos hechos singulares que serán determinantes al hacer el balance judicial, no se justifica una norma obligatoria de cierre total de las puertas del tribunal. 3 *Rotunda, Nowak y Young, Treatise on Constitutional Law: Substance and Procedure* Sec. 20.25.

Entre estos intereses, uno de los más importantes es el derecho del acusado a un juicio justo e imparcial. La publicidad excesiva de los procedimientos criminales que sea perjudicial al acusado hace más difícil la selección de un Jurado imparcial y la celebración de un juicio justo. Aunque en la gran mayoría de los casos no surge conflicto entre el derecho del acusado y el de la prensa a un juicio justo, corresponde a los tribunales hacer el delicado balance entre estos derechos de igual jerarquía constitucional. *Pueblo v. Pérez Santaliz*, 105 D.P.R. 10 (1976). Con el propósito de garantizar un juicio justo e imparcial, hemos autorizado a los tribunales a tomar las medidas siguientes: (1) un *voir dire* extenso y riguroso; (2) el secuestro o aislamiento del Jurado; (3) instrucciones cuidadosas y exhaustivas sobre la responsabilidad de rendir un veredicto fundamentado exclusivamente en la prueba presentada; (4) traslado de los procedimientos, y (5) suspensión de los procedimientos. Véanse, también: *Pueblo v. Lebrón González*, 113 D.P.R. 81 (1982); *Pueblo v. Pérez Santaliz*, supra; *Pueblo v. Fournier*,

77 D.P.R. 222 (1954); *Pueblo v. Echevarría Rodríguez I*, 128 D.P.R. 299 (1991).

Igualmente ocurre cuando surge un conflicto con el derecho de intimidad del acusado o de la víctima. La tarea no es fácil, pero "[l]os tribunales tienen los poderes y los instrumentos necesarios para ... minimizar los efectos adversos de la publicidad anterior al juicio". *Pueblo v. Hernández Mercado*, supra, pág. 437.

Examinada nuestra jurisprudencia y los criterios utilizados al resolver conflictos entre el derecho a la intimidad y a un juicio justo e imparcial, y la libertad de expresión y prensa, veamos la experiencia en Estados Unidos y la doctrina formulada por el Tribunal Supremo federal al establecer el contenido mínimo de los derechos consagrados por la Primera y Decimocuarta Enmiendas.

## II

La exclusión del público y la prensa de los procedimientos criminales ha sido motivo de amplia discusión en la jurisprudencia norteamericana. Anotación, *Exclusion of Public During Criminal Trial*, 48 A.L.R.2d 1436 (1956); Anotación, *Right of Person Accused of Crime to Exclude Public from Preliminary Hearing or Examination*, 31 A.L.R.3d 816 (1970). Fue en *Richmond* donde por primera vez una mayoría de los jueces del Tribunal Supremo federal señaló que el público y la prensa tienen un derecho constitucional de acceso a los juicios criminales al amparo de la Primera y Decimocuarta Enmiendas. Para reconocer la existencia de dicho derecho constitucional fue crucial, en el análisis de los jueces, el hecho de que históricamente el juicio criminal había sido público y, particularmente, que este derecho aseguraba un proceso justo. Concluyeron, además, que el carácter público del juicio garantizaba un valor terapéutico para la comunidad (*community therapeutic value*).

Es decir, el hecho de que el público y la prensa estén presentes en el juicio asegura que los ciudadanos tengan una mayor confianza y fe en el sistema de justicia criminal, disipando así las dudas que de ordinario genera un procedimiento cerrado:

La ciudadanía en una sociedad abierta no requiere que sus instituciones sean infalibles, pero es difícil para ellos aceptar lo que se les prohíbe observar. (Traducción nuestra.) *Richmond*, pág. 572.

Dos (2) años más tarde, en *Globe*, el Tribunal Supremo federal concluyó que ese derecho de acceso impide que se excluya al público durante el juicio aun en casos de delitos sexuales.

Además, en *Press-Enterprise Co. v. Superior Court of Cal.*, 464 U.S. 501 (1984) (en adelante *Press-Enterprise I*), el Supremo federal extendió esta doctrina al proceso de insaculación del Jurado o *voir dire*. El Alto Foro federal concluyó que existe una presunción de juicio público que debe controvertir quien reclame un proceso privado. El tribunal deberá auscultar todas las alternativas disponibles antes de autorizar el cierre de los procedimientos.

Aunque es característico de la jurisprudencia antes señalada el hecho de que atienden controversias relacionadas con la apertura del juicio en su fondo, en *Waller v. Georgia*, 467 U.S. 39 (1984) (en adelante *Waller*), se extendió el derecho de acceso a la vista de supresión de evidencia.

Finalmente, en *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) (en adelante *Press-Enterprise II*), se concluyó que el derecho de acceso del público y la prensa era extensivo a la vista preliminar. Invocando los mismos fundamentos expuestos en *Press-Enterprise I*, que lo hacían extensivo al juicio y al proceso de desinsaculación de jurados o *voir dire*, el Supremo federal hizo énfasis *en la presunción de apertura al público* que se manifiesta histórica-

mente a través de los procedimientos criminales. También destacó el efecto terapéutico que tiene para la comunidad poder observar los procesos judiciales criminales:

"La ventaja de la apertura (*openness*) radica en el hecho de que las personas que no acuden a presenciar los procesos judiciales pueden estar completamente seguros de que dichos procesos se están siguiendo de acuerdo con los criterios de equidad; la certeza de que cualquiera puede asistir libremente a un juicio garantiza que se están siguiendo los procedimientos establecidos y que cualquier irregularidad saldrá a la luz pública. *La apertura por lo tanto enriquece la imparcialidad básica que debe permear el proceso criminal y la apariencia de equidad tan esencial para la confianza del público en el sistema.*" (Traducción nuestra, énfasis en el original suprimido y énfasis suplido.) *Press-Enterprise II*, pág. 13.

Después de recordar que una de las formas en que a un acusado puede garantizársele un proceso justo es asegurándose que éste sea público, el Supremo federal enfatizó que el problema de Primera Enmienda no podía ser resuelto exclusivamente a base del calificativo que reciba el proceso. El hecho de que una vista preliminar no sea lo mismo que un juicio plenario no justifica menor protección al derecho constitucional de acceso. Este es un derecho suficientemente amplio que también se extiende a la vista preliminar:

2. Bajo la Primera Enmienda, el público en general y la prensa en particular tienen un derecho de acceso al juicio y otros procedimientos criminales. Se trata de un derecho implícito en la Primera Enmienda, distinto del derecho explícito en la Enmienda Sexta que garantiza al acusado un juicio público. Este derecho de acceso es lo suficientemente amplio para extenderse al procedimiento de selección del jurado, *a vista preliminar* y a una vista de supresión de evidencia. En virtud de este derecho de acceso, *el acusado no tiene derecho absoluto a renunciar al juicio público que le garantiza la Enmienda Sexta e insistir en un juicio o vista en privado*. Aun en casos en que juez, fiscal y defensa estén todos de acuerdo en el juicio privado, el público y la prensa podrían oponerse y prevalecer. (Énfasis suplido y escolios omitidos.) E.L. Chiesa, *Derecho Procesal Penal*

*de Puerto Rico y Estados Unidos,* Colombia, Ed. Forum, 1991, Vol. II, Sec. 13.2C. 2, págs. 203–204.

Además, en *Press-Enterprise II,* fue determinante el hecho de que, debido a la naturaleza extensiva de la vista preliminar, en ocasiones es la última y más importante etapa del proceso criminal. También, *en múltiples ocasiones resulta ser " 'la única ocasión para que el público pueda observar el sistema de justicia criminal' ".* (Traducción nuestra y énfasis suplido.) Íd., pág. 12.

Al resolver que los pronunciamientos de *Press-Enterprise II* no son aplicables a la Regla 23 (c) de Procedimiento Criminal, 34 L.P.R.A. Ap. II, la opinión mayoritaria interpreta de forma restrictiva el alcance de la Primera Enmienda a la vista preliminar en Puerto Rico. En particular, la decisión olvida que el eje decisorio de todos estos casos es la presunción de apertura de los procedimientos judiciales criminales para garantizar no solamente un juicio justo, *sino también promover el "valor terapéutico comunitario* y la legitimidad de las decisiones".

Evaluada la normativa jurisprudencial aplicable, corresponde analizar si la Regla 23(c) de Procedimiento Criminal, *supra,* es constitucional.

## III

La vista preliminar en Puerto Rico está regulada por las Reglas 23 y 24 de Procedimiento Criminal, 34 L.P.R.A. Ap. II.[2] El inciso (c) de la citada Regla 23 dispone que:

---

[2] Con la aprobación de la Ley Núm. 29 de 19 de junio de 1987 se enmendó la Regla 23 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, a los fines de agilizar el proceso judicial. El imputado sólo tenía derecho a vista preliminar cuando había cometido delito grave y estaban presentes unas circunstancias. Sin embargo, tres (3) años después, mediante la Ley Núm. 26 de 8 de diciembre de 1990, por entender que se podrían estar violando derechos fundamentales del acusado, la legislatura enmendó la ley a los efectos de que a todo imputado de delito grave se le garantice la celebración de la vista preliminar.

"... La vista será privada a menos que al comenzar la misma persona solicitare que fuera pública".

El texto de esta disposición es claro. En Puerto Rico, por mandato legislativo, la vista es obligatoriamente privada.

Contrario a la experiencia en Estados Unidos, la vista preliminar se incorporó a nuestro ordenamiento procesal penal en 1964. Está inspirada fundamentalmente en su equivalente federal pero toma características, además, del Código de Enjuiciamiento Criminal vigente en aquella época, del Código Modelo del American Law Institute, del Código Penal de California en su parte procesal y otros. *Hernández Ortega v. Tribunal Superior*, 102 D.P.R. 765 (1974).

El esquema de la regla es amplio e incluye pocos detalles. *Pueblo v. Rodríguez Aponte*, 116 D.P.R. 653, 663 (1985). Aunque en Puerto Rico la lectura de la acusación es posterior a la vista preliminar, tanto aquí como en California su propósito es "evitar que se someta a un ciudadano en forma arbitraria e injustificada a los rigores de un proceso criminal". *Pueblo v. López Camacho*, 98 D.P.R. 700, 702 (1970). Véase, también, N. Frattallone Di Gangi, *La Vista Preliminar*, Año XVI (Núm. 63) Rev. Der. Pur. 231, 236 (1977). Este objetivo está fundamentado en la tesis de que "es insuficiente la determinación de causa probable para el arresto, por razón de que el denunciante puede sin razón válida alguna imputar un delito, y en virtud de la naturaleza no adversativa de la determinación de causa probable para el arresto o citación —que puede hacerse en ausencia del imputado— se someta 'arbitrariamente' a un ciudadano a un juicio por delito grave. El resultado es que es injusto someter al ciudadano al rigor de un juicio por delito grave sin previa oportunidad de vista adversativa donde se justifique la celebración de un juicio". Chiesa, *op. cit.*, Vol. III, Sec. 22.1, pág. 64.

La vista preliminar claramente constituye un cedazo ju-

dicial "que sirve el propósito de impedir que acusaciones frívolas e insustanciales recarguen la labor del Tribunal Superior .... Dicha vista, por lo tanto, no es una mera formalidad, sino un acto judicial de contornos definidos en el curso procesal, de incuestionable trascendencia pues el resultado habrá de reflejarse en la libertad del procesado". *Hernández Ortega v. Tribunal Superior*, supra, pág. 771, opinión concurrente del Juez Asociado Señor Díaz Cruz.

Para lograr dicho fin, la regla dispone que el imputado tendrá derecho a estar representado por abogado, a contrainterrogar testigos de cargo, ofrecer prueba a su favor y obtener las declaraciones juradas de los testigos que el Fiscal haya puesto a declarar en la vista. Además, podrá presentar la defensa afirmativa de locura o coartada. *Hernández Ortega v. Tribunal Superior*, supra.

El Fiscal, por su parte, podrá estar presente en la vista y confrontar la evidencia ofrecida por el imputado. No tendrá, sin embargo, que presentar toda la prueba que tenga disponible puesto que para la determinación de causa en vista preliminar el estándar probatorio es distinto al requerido en el juicio para lograr una convicción. No obstante, tendrá que desfilar prueba de todos y cada uno de los elementos del delito imputado.[3]

Por otro lado, "[d]istinto de otras jurisdicciones donde la vista preliminar es una vista de récord, en Puerto Rico la práctica es que se celebra en una sala pequeña o en la oficina del juez, sin que se graben mecánicamente o se perpetúen las incidencias por taquigrafía o estenotipia. Los testigos son excluidos de la vista antes y después de declarar.... Salvo estos funcionarios, nadie más sabe qué ocurrió en la vista, pues ésta se celebra literalmente 'a puertas

---

[3] El hecho de que en *Pueblo v. Rodríguez Aponte*, 116 D.P.R. 653 (1985), señalamos que la vista preliminar no es un "mini juicio", no significa que no goce de infinidad de características que en efecto tiene un juicio. La mera aseveración en *Rodríguez Aponte*, supra, no desvirtúa la naturaleza eminentemente judicial de la vista preliminar.

cerradas' y sin récord". H.A. Sánchez Martínez, *La vista preliminar: ¿pública o privada?*, 7 (Núm. 2) Forum 7, 9 (1991).

Una vez con la evidencia ante sí, el juzgador determina si tal prueba establece todos los elementos del delito y si existe la probabilidad de que el imputado lo haya cometido. Si el tribunal no está convencido de que están presentes los elementos del delito y de que es probable que el imputado lo haya cometido, deberá hacer una determinación de no causa.

De lo anterior se desprende que la vista preliminar constituye una etapa muy significativa en nuestro ordenamiento procesal penal: "[Aunque] el objeto central de la vista preliminar no es hacer una adjudicación en los méritos en cuanto a la culpabilidad o inocencia del acusado, " *Pueblo v. Rodríguez Aponte*, supra, pág. 665, " '[e]n *su objetivo ... dicha vista es judicial [y a]sí debe[rá] ser la esencia de su procedimiento'* ". (Énfasis suplido.) *Pueblo v. Opio Opio*, 104 D.P.R. 165, 171 (1975). Véase *Rodríguez Aponte*, supra.[4] "[L]a vista está encaminada a proteger a la persona imputada a través de un filtro o cedazo judicial por el cual el Estado tiene que pasar prueba, y demostrar si está justificado o no a intervenir con la libertad de un ciudadano y someterlo a los rigores y contingencias de un juicio plenario." *Rodríguez Aponte*, supra, pág. 665. Por su importancia en el derecho procesal penal, nuestro ordenamiento reconoce que en esa etapa el imputado tiene las garantías descritas anteriormente que son similares a las que tiene en un juicio.

Por lo tanto, resulta difícil comprender la interpretación

---

[4] En *Pueblo v. Rodríguez Aponte*, supra, pág. 665, además expresamos específicamente sobre la vista preliminar: "[A]unque se trata de una función propiamente judicial, no es 'un mini-juicio'." (Énfasis suplido.)

Aunque en Puerto Rico existe en los libros dicha institución, no se ha utilizado por varias décadas. Tal institución está regulada por la Ley Núm. 58 de 18 de junio de 1919, según enmendada, 34 L.P.R.A. sec. 521 *et seq.*

que hoy hace la mayoría a los efectos de que la vista preliminar es "un mecanismo procesal sencillo" y que cumple una "función investigativa judicial". Utilizar este calificativo para describir los propósitos de la vista preliminar de Puerto Rico sería equipararla a la institución angloamericana del Gran Jurado o a los magistrados italianos. Dicha proposición es insostenible.

El Gran Jurado es una institución profundamente enraizada en la tradición norteamericana. Su única similitud con la vista preliminar es que cumple con la función de indagar preliminarmente en la comisión de un delito para posteriormente determinar si debe someterse al imputado a los rigores de un proceso judicial plenario. Véanse: *Hurtado v. California*, 110 U.S. 516 (1884); *Branzburg v. Hayes*, 408 U.S. 665 (1972).

Sus diferencias con la vista preliminar son patentes puesto que es, en primer lugar, un procedimiento exparte, no adversativo. *United States v. Calandra*, 414 U.S. 338 (1974). Se caracteriza por su secreto y, una vez constituido, el Gran Jurado tiene poderes investigativos independientes y puede citar testigos. La persona investigada no tiene derecho a estar presente ni a contrainterrogar testigos o presentar sus propios testigos. Tampoco tiene derecho a estar asistido por un abogado. Finalmente, el secreto del Gran Jurado no es para beneficio del sospechoso, pues esa persona no tiene derecho a solicitar que el procedimiento sea abierto. En otras palabras, es un procedimiento en el cual el sospechoso no tiene los mismos derechos constitucionales que tiene en la vista preliminar o en el juicio. *United States v. Mandujano*, 425 U.S. 564 (1976).[5]

Completamente distinta es la situación de la vista

---

[5] El Tribunal Supremo de Estados Unidos resolvió, específicamente en *United States v. Mandujano*, 425 U.S. 564 (1975), que en el procedimiento de Gran Jurado, el imputado no tiene derecho a estar asistido de abogado. Se ha reconocido, sin embargo, que este derecho sí le asiste al imputado durante la celebración de una vista preliminar.

preliminar. Como claramente dispone la regla que la gobierna y su jurisprudencia interpretativa, gran parte de los derechos constitucionales que cobijan a un acusado durante el juicio lo protegen también durante la vista preliminar. Tan cierta es esta aseveración que en *Pueblo v. Opio Opio*, supra, resolvimos que los términos de juicio rápido que establece la Constitución para la celebración de la vista plenaria en su fondo son aplicables a los procedimientos de vista preliminar. Al así resolver, dejamos establecido que:

> El derecho a juicio rápido no se circunscribe al acto del juicio propiamente dicho; se extiende para abarcar todas las etapas en progresión gradual desde la imputación inicial de delito.... En términos del derecho fundamental de todo ser humano a sentirse libre de la opresión y la preocupación martirizante que genera una acusación injusta, no hay diferencia apreciable entre la demora en someter la acusación al crisol depurante de la vista preliminar y la tardanza en celebrar el juicio para la decisión final sobre culpabilidad o inocencia. *Pueblo v. Opio Opio*, supra, pág. 169.

Al igual que en Estados Unidos, *Waller*, en la vista preliminar en Puerto Rico se dispone finalmente de un gran número de casos criminales. Para muchas personas resulta ser el último proceso de su encausamiento criminal.[6]

Por ende, al amparo de los derechos consagrados tanto en la Constitución del Estado Libre Asociado como en la de Estados Unidos, de ordinario, el público debe tener acceso a la vista preliminar. Solamente en circunstancias excepcionales debe el tribunal cerrar la vista preliminar. En estos casos el tribunal debe hacer determinaciones de que se

---

[6] De hecho, según surge del Informe Anual de la Rama Judicial, hacia los años 1989 y 1990, el veintinueve por ciento (29%) de las vistas preliminares resueltas representaron el último contacto del imputado con el sistema de justicia criminal.

Entre 1989 y 1990 en Puerto Rico se resolvieron trienta y tres mil setecientas ochenta (33,780) vistas preliminares. De ese total, seis mil diez (6,010) culminaron por no haber causa probable y tres mil setecientas noventa y siete (3,797) fueron archivadas.

justifica el cierre para preservar unos valores de gran importancia comunitaria y que la decisión está diseñada restrictivamente para atender estos intereses. *Press-Enterprise II*, págs. 13–14. Véase, también, Chiesa, *op. cit.*, Sec. 22.4C. Por estas razones disentimos enérgicamente de la opinión mayoritaria. Bajo la normativa anteriormente expuesta, la Regla 23(c) de Procedimiento Criminal, *supra*, es inconstitucional.

## IV

No empece lo anteriormente expuesto, la opinión del Tribunal invierte el esquema de análisis constitucional federal al no pasar juicio sobre la validez del cierre obligatorio de las vistas preliminares y al exigirle, a quien pretenda su apertura, que demuestre que el imputado ha renunciado a su derecho a que este procedimiento sea privado o que existen circunstancias que demuestren que no está presente el derecho que se intenta proteger. De acuerdo con lo que hoy resuelve este Tribunal, se da la anomalía de que quien reclame un derecho de acceso tenga que demostrar circunstancias especiales.

Esta situación queda agravada por el hecho de que la opinión mayoritaria está totalmente carente de criterios o directrices que asistan a los tribunales en la determinación de cuándo están presentes las excepciones que justifican la apertura sobre la oposición del acusado. Al considerar solamente las diferencias entre la vista preliminar nuestra y la de California, en el proceso de decidir si el caso de *Press-Enterprise II* aplica en Puerto Rico, el Tribunal omite una parte esencial del análisis constitucional sobre la Primera y Decimocuarta Enmiendas.

Aun considerando que fuera necesario un examen minucioso de lo que distingue nuestra vista preliminar de la vista preliminar de California, no estamos convencidos de

que dichas diferencias sean *tan sustanciales como para justificar el rechazo del caso federal de Press-Enterprise II.*

La posición mayoritaria está apuntalada en la premisa de que en Puerto Rico la vista preliminar "se lleva a cabo en la etapa investigativa judicial ...". Opinión mayoritaria, pág. 425. La falacia de esta posición es evidente. En nuestro ordenamiento procesal penal la función de los tribunales es *adjudicativa* y no *investigativa*. A quien le corresponde la función de investigar los actos delictivos es al Ministerio Público. La vista preliminar le brinda una oportunidad al Fiscal para demostrarle al tribunal que existe causa probable para creer que se ha cometido un delito y que la persona ante el juez lo cometió. Al hacer su determinación el tribunal "se encuentra entre las partes 'no como interesado, sino como juez. En su objetivo y función, dicha vista es judicial. Así debe ser la esencia de su procedimiento' ". 1 *Wright and Miller, Federal Practice and Procedure: Civil 2d* Sec. 85, pág. 181 (1982).

Por otro lado, la opinión mayoritaria asume que en California la lectura de los cargos requeridos por la Regla 859(b) del Código Penal, West's Ann.Cal.Penal Code Sec. 859(b), convierte al imputado en un acusado. Aunque en California estatutariamente se requiere esta lectura al comenzar la vista, esto realmente no significa que ese proceso tenga un objetivo distinto al de Puerto Rico. En ambas jurisdicciones su propósito únicamente es la determinación de causa probable para someter al imputado a un juicio. Véanse, a modo comparativo: *Burris v. Superior Court of Tulare County,* 117 Cal. Reptr. 898, 43 C.A.3d 530 (1974), y *Pueblo v. Rodríguez Aponte,* supra. En este sentido, la diferencia entre ambas jurisdicciones señalada por la opinión mayoritaria es de naturaleza semántica y no conceptual.[7]

----

[7] De hecho, en *Press-Enterprise II* el Supremo federal hizo claro que cuando el Sr. Roberto Díaz solicitó que se cerrara la vista preliminar, el tribunal municipal de

La Opinión del Tribunal también está fundamentada en la tesis de que en Puerto Rico no se ha resuelto si las reglas de evidencia aplican a este procedimiento y que en California, por el contrario, sí aplican. Según la mayoría, esta inaplicación del ordenamiento probatorio a la vista preliminar tiene como consecuencia que el público, los miembros potenciales del Jurado y la prensa se contaminen en esta etapa con evidencia que ulteriormente sería inadmisible en el juicio plenario. No le asiste la razón.

Si bien es cierto que las Reglas de Evidencia aplican a la vista preliminar de California, algunas disposiciones son inaplicables. El 5 de junio de 1990, tanto la Constitución del Estado de California como la parte procesal de su Código Penal, fueron enmendadas para permitir la admisión de prueba de referencia. A partir de 1990 el Art. I, Sec. 30(b), dispone que:

> (b) In order to protect victims and witnesses in criminal cases, hearsay evidence shall be admissible at preliminary hearings, as prescribed by the Legislature or by the people through the initiative process. West's Ann.Cal.Const. Art. I, Sec. 30(b) (Supp.).

La Sec. 872 del Código Penal de California dispone, por su parte, que:

> (b) Notwithstanding Section 1200 of the Evidence Code, the finding of probable cause may be based in whole or in part upon the sworn testimony of a law enforcement officer relating the statements of declarants made out of court offered for the truth of the matter asserted. Any law enforcement officer testifying as to hearsay statements shall either have five years of law enforcement experience or have completed a training course certified by the Commission on Peace Officer Standards and Training which includes training in the investigation and reporting of cases and testifying at preliminary hearings. West's Ann.Cal.Penal Code Sec. 872 (Supp.)

California lo que estaba considerando era una denuncia (*complaint*) y no una acusación.

Mediante la aprobación de ambas enmiendas se creó en California una excepción específica para la vista preliminar. Esto es que, para proteger víctimas y testigos, el juzgador podrá fundamentar su determinación en prueba de referencia aunque ésta, el día del juicio plenario, sea inadmisible por no estar dentro de las excepciones del ordenamiento probatorio.[8]

Por ser admisible prueba de referencia en la vista preliminar de California, ésta no goza de la asepsia que pretende atribuirle la opinión mayoritaria. Tampoco crea una diferencia abismal entre la vista preliminar de California y la de Puerto Rico que justifique la inaplicación de *Press-Enterprise II*. A la luz de la tesis de la mayoría, al no existir la protección de la totalidad del ordenamiento evidenciario —y siendo la vista preliminar pública— en California también existe una posibilidad de que se lesione el derecho del imputado a un juicio justo e imparcial. No podemos refrendar esa interpretación.

La determinación de causa probable en la vista preliminar en Puerto Rico la dictamina un magistrado. A diferencia del posible perjuicio que la publicidad excesiva pueda tener sobre los jurados en el juicio, en la vista preliminar es un juez con experiencia previa y conocimiento del derecho quien toma la decisión. Por su entrenamiento y sus conocimientos de la materia, el juez está capacitado para, imparcialmente, tomar la decisión que proceda en derecho, libre de las influencias de la información periodística. La presencia del público y de la prensa en la vista preliminar no pervertirá el proceso adjudicativo. Además, los tribunales, posteriormente, siempre podrán tomar las medidas pertinentes que sean necesarias para seleccionar a un Ju-

---

[8] En California se ha resuelto que estas enmiendas no violan el derecho a confrontación del acusado protegido por la Sexta Enmienda de la Constitución federal. *Montez v. Superior Court (People)*, 285 Cal. Reptr. 279 (1991).

rado imparcial, incluso el traslado a otra sala y la posposición del juicio.

Bajo nuestro ordenamiento, la aplicación de las Reglas de Evidencia no evita que una publicidad excesiva lesione el derecho de un imputado a un juicio justo. De hecho, "la publicación de noticias sobre el proceso judicial no constituye de por sí una violación al derecho del acusado a un juicio justo e imparcial". *Pueblo v. Pérez Santaliz*, supra, pág. 14. Lo que garantiza que esto no ocurra son las medidas que adopte el tribunal para evitar que el Jurado se contamine con la información inflamatoria o parcializada que pervierta al proceso adjudicativo. *Pueblo v. Hernández Mercado*, supra.

La tesis mayoritaria también está apuntalada en la teoría de que la vista preliminar privada protege el derecho de intimidad de un imputado. Su posición ignora que, una vez se le imputen cargos a una persona, esa información es pública. También son públicos los datos relativos a los denunciantes y a la fecha en que ocurrieron los hechos delictivos imputados. De hecho, en la gran mayoría de los casos ésta es la información que genera la publicidad inicial en los casos.

Por otro lado, la opinión mayoritaria también sostiene que "[l]a privacidad de la vista es el medio más efectivo que posee el Estado para proteger el derecho a la presunción de inocencia, a un juicio justo e imparcial y a la intimidad de una persona en esta etapa investigativa judicial del proceso criminal". Opinión mayoritaria, pág. 433. Este razonamiento sofista parte de la premisa apriorística de que la presencia del público siempre lesiona el derecho de intimidad del acusado y su presunción de inocencia. Sin embargo, no toma en consideración el efecto intimidante que representa para el ciudadano una vista en que se excluya a los familiares del imputado. Además, ignora la desconfianza que genera un proceso al que el perjudicado y sus familiares tampoco puedan asistir.

Aunque el derecho de intimidad goza de preeminencia constitucional, en ocasiones hemos reconocido que tiene que ceder a otros derechos constitucionales e intereses apremiantes del Estado: "Los casos de difamación plantean esencialmente la necesidad de determinar el peso respectivo del interés en una ciudadanía debidamente informada, en fomentar el debate vigoroso sobre cuestiones de interés público, de un lado, y el derecho a la intimidad, del otro." *Clavell v. El Vocero de P.R.*, 115 D.P.R. 685, 691 (1984). Para resolver la tensión entre estos derechos de igual jerarquía, hemos utilizado diferentes métodos aplicables a las circunstancias particulares de cada caso. Véase Chiesa, *op. cit.*, Vol. 1, Sec. 6.8. Bajo esta normativa, procede que, en vez de avalar la vista privada, reconozcamos que la adjudicación de este conflicto debe hacerse caso a caso a la luz de los distintos reclamos de las partes afectadas.

## V

Al evaluar la constitucionalidad de una norma que obligatoriamente impone el cierre de la vista preliminar y deja en manos del acusado la prerrogativa de su apertura, somos conscientes de que es imperativo hacer un balance de varios intereses. Deben contraponerse, en primer lugar, el derecho constitucional de acceso frente al derecho del imputado a un juicio justo e imparcial. Al hacer este balance es necesario que se tome en consideración que existe una presunción de apertura la cual sólo puede rebatirse demostrando la existencia de un interés estatal apremiante o circunstancias extraordinarias. No podemos perder de vista que el imputado no tiene ningún derecho constitucional a que la vista preliminar sea privada. Este derecho es estatutario. Véase Sánchez Martínez, *supra.*

La solución no puede ser el cierre total de los procedimientos en la vista preliminar a menos que al comenzar

ésta el imputado solicite que sea pública. Esto realmente representa una abdicación de la responsabilidad del tribunal de hacer el balance de intereses caso a caso. Por otro lado, significaría que, mediante legislación, se declarara que un derecho tiene mayor jerarquía que otro:

> Los autores de la Carta de Derechos no tenían la intención de establecer jerarquías entre los derechos de la Primera Enmienda y los de la Sexta Enmienda, asignándole mayor rango a unos sobre los otros. En este caso, los peticionarios quisieran que declaráramos que los derechos del acusado están subordinados a su derecho a publicar en cualquier circunstancia. En la medida en que los creadores de estas garantías, plenamente conscientes de los conflictos potenciales que las mismas podrían generar, no quisieron o no pudieron resolver este asunto dándole prioridad a unas garantías sobre otras, no nos compete a nosotros *reescribir* la constitución para hacer lo que ellos se negaron a hacer. (Traducción nuestra y énfasis suplido.) *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 561 (1976).

En todas las ocasiones anteriores en que tanto el Supremo federal como éste se han enfrentado a la compleja tarea de hacer este balance de intereses, se ha hecho inclinando la balanza para darle al público acceso a los procedimientos judiciales. Sólo en circunstancias excepcionales se han tomado medidas restrictivas una vez han sido debidamente justificadas. Hoy abandonamos completamente nuestros precedentes y permitimos a priori que los imputados tengan la llave para abrir o cerrar las puertas del tribunal.

Contrario a la normativa expuesta anteriormente, la mayoría de este Tribunal inclina la balanza a favor del cierre de la vista preliminar aplicándola indiscriminadamente a todos los casos y sólo, en circunstancias excepcionales, permite que la comunidad se entere de lo que verdaderamente ocurre tras las puertas cerradas de los tribunales. Su posición parte de la premisa de que el país no debe estar enterado de lo que ocurre en los procedimientos judiciales y presume que la presencia de la prensa y la

comunidad necesariamente va a ser contraria a los intereses de los imputados y de la comunidad.

Finalmente, la estructura conceptual y los fundamentos de la opinión mayoritaria culminan elevando a rango constitucional la intimidad de la vista preliminar provista por la Regla 23 de Procedimiento Criminal, *supra*, ignorando su génesis estatutaria y limitando el poder de este Tribunal y de la Asamblea Legislativa de revisar este esquema para abrir las puertas y permitir a la prensa informar al país sobre lo que ocurre en los casos criminales. En vista de los pronunciamientos de la Opinión del Tribunal, si la Asamblea Legislativa decide hacer pública la vista preliminar tendrá que efectuar una revisión total del procedimiento, incluso la etapa de la lectura de la acusación. El alcance de sus pronunciamientos es lesivo a la doctrina de separación de poderes.

Recordemos que vivimos en un sistema democrático donde el pueblo tiene un derecho a estar informado y que este acceso garantiza que los ciudadanos estén adecuadamente preparados para tomar las decisiones que afectan la vida comunitaria. En el caso particular de la Rama Judicial, la divulgación de lo que ocurre en los procedimientos judiciales permite que el público conozca mejor el trabajo realizado por todos los integrantes del sistema y asegura que los procedimientos sean justos y equitativos. La apertura fortalece la confianza del pueblo en la Rama Judicial y garantiza la pureza de los procedimientos y la legitimidad de nuestras decisiones:

> El comentario y el reportaje en torno al sistema de justicia criminal es la médula de los valores encarnados en la Primera Enmienda, en vista de que la función y la integridad de dicho sistema es de importancia crucial para aquellos ciudadanos interesados en la administración del gobierno. La secretividad en torno a las acciones judiciales solamente puede engendrar la ignorancia y la desconfianza en los tribunales y arrojar sospechas sobre la competencia de imparcialidad de los jueces; el reportaje, la crítica y el debate libre y robusto pueden contri-

buir a que el público entienda el principio de ley y comprenda mejor el funcionamiento de todo el sistema de justicia criminal, así como a mejorar la calidad de dicho sistema al someterlo a los efectos purificadores de la divulgación y de la responsabilidad ante el público. (Traducción nuestra.) *Nebraska Press Assn. v. Stuart*, supra, pág. 587, opinión concurrente del Juez Asociado Señor Brennan.

Por las razones anteriormente expuestas, disentimos. Declararíamos inconstitucional la parte de la Regla 23(c) de Procedimiento Criminal, *supra*, que cierra las puertas del tribunal cuando se efectúe una vista preliminar. Por nuestra parte, abriríamos las puertas de los tribunales cuando celebren vistas preliminares y sólo permitiríamos una sesión privada ante la presencia de un interés social apremiante que sólo así se pueda proteger.